ROBERT T. GRAY, Plaintiff-Appellant, *v.* MARY ANN GRAY, Defendant-Appellee.

Second District   No. 76-399

Opinion filed February 22, 1978.—Rehearing denied March 22, 1978.

Hart, Banbury & Banbury, of Aurora, for appellant.

Gerald M. Sheridan, Jr., of Wheaton, for appellee.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

The trial court awarded a divorce to the husband and gave custody of the five minor children of the marriage to the wife. The wife was granted alimony as well as support for the children and in the absence of a property settlement agreement between the parties themselves, the court made certain dispositions of the marital property.

The husband appeals the award of the custody of the children to the wife, as well as some aspects of the property division and the award of attorneys' fees to the wife. The wife appeals from that part of the decree awarding the husband a divorce on the ground of mental cruelty and contends the support provision is inadequate and the division of the property is unfair in awarding some interest to the husband in property owned solely by her.

Robert and Mary Ann Gray were married in 1965. Five children were born of the marriage. (Although the husband denied he was the father of two of the children, they were all born during coverture and since there was no evidence to show that any one else was the father, the trial court treated the five children as the husband's.)

The marriage was a stormy one and on July 5, 1973, the husband left the marital home in Clarendon Hills and did not again live permanently with the wife, although he continued to visit her and the children in the Clarendon Hills home for a year or so after that. In July 1974 the husband filed suit for divorce on the grounds of mental cruelty. The suit was originally filed in the Du Page County circuit court, but was later transferred to the 16th Judicial Circuit, Kendall County. The wife counterclaimed for separate maintenance and requested temporary alimony, custody and child support and denied there was any ground for divorce. She also requested exclusive possession of the marital home in Oswego which the parties had acquired in November 1973 and had put in joint tenancy. (The husband testified he bought the Oswego house in a reconciliation attempt, after his departure from the Clarendon Hills home.)

The husband owned the Robert T. Gray Company, which was incorporated. However, he described himself as a "manufacturers' representative." The business was concerned with the manufacture and sale of machine parts and the testimony at trial indicated his income before taxes was about $27,000 in 1972 and about $30,000 in 1973. His 1974 income tax return showed a taxable income of $28,300.

Shortly after the couple was married they bought a two-bedroom house

in Clarendon Hills, which they still owned at the time of the divorce proceedings. The wife already had two teenage daughters by a previous marriage and after several children were born of the marriage the house became very crowded and the testimony indicated this crowded condition contributed to the tension which built up between husband and wife. It was difficult to keep the house neat and the husband had no privacy. In July 1973, after several quarrelsome incidents between them and charges by the wife that the husband was a homosexual, a dope fiend and a racketeer, the husband left the marital home and told her he was not coming back. He testified the wife had insulted him, struck him, chased him out of the house and made life miserable for him to the extent it had begun to affect his health. He also testified that, in an attempt to bring about a reconciliation, he offered to buy a larger house for the family. They looked around and found an unfinished house on the outskirts of Oswego in Kendall County, which they purchased in their joint names in November 1973. The husband testified he had never lived in the Oswego house because his wife would not allow him to. In any event, he apparently took little interest in completing it and did not assist her to move into the new house from the Clarendon Hills house, although apparently expecting her to do so in order that he could sell the Clarendon Hills house. The Oswego house was unfinished but livable. The husband testified the wife refused to sell the Clarendon Hills house and let her teenage daughter by her first marriage live there by herself, while Mrs. Gray and the rest of the children lived in the Oswego house and the husband lived in a flat in Cicero, where his business was located. In July 1974 he filed suit for divorce. After many acrimonious sessions of court hearings, regarding grounds for divorce, support money and division of property and custody of the children, the trial court granted the husband a divorce and granted the wife custody of the children. Since the parties could not agree on a property settlement, the trial court allotted the marital assets between them, as he thought was fair, and for the best interests of all concerned, including the children.

In the decree the trial court (1) granted a divorce to the husband, rejecting the wife's plea for separate maintenance (she was a Jehovah's Witness and did not believe in divorce); (2) granted custody of the children to the wife; (3) granted $200 per month to the wife as "alimony" (indicating, however, that he was doing this in order to help the husband out because he could take a tax deduction for this amount. This alimony was to terminate upon the youngest child reaching the age of 16); (4) awarded the wife $500 per month for support of the five minor children, plus an allowance for extraordinary medical expenses, if such were incurred; (5) ordered the jointly owned Clarendon Hills house to be sold and the proceeds to be applied to the mortgage on the Oswego house; (6)

ordered the joint tenancy title in the Oswego house to be severed and to be replaced by tenancy in common; (7) provided that the Oswego house could be sold at any time by mutual agreement of the parties, and that otherwise the wife and children should have exclusive possession of it, until the earliest of one of the following: (a) remarriage of the wife; (b) the youngest child reaching age 16; (c) the wife voluntarily vacating the premises for a period of 90 days. Upon the happening of any of these events, the Oswego house was to be sold and the net proceeds divided equally between the parties. However, the husband was to be first reimbursed for any principal amount or interest on the mortgage he had paid, following the sale of the Clarendon Hills house, and application of its net proceeds to the Oswego house mortgage (if the Clarendon Hills house did not bring in enough to pay off the Oswego mortgage). Thus, the husband was responsible for any mortgage payments remaining on the Oswego house, after the Clarendon Hills house proceeds were applied to it, but would be reimbursed for such expenditures, after the Oswego house was sold. He also was required to pay the taxes and insurance, which likewise would be deductible from the sale proceeds of the house. The wife had the first refusal in the sale of the Oswego house.

The parties were also purchasing under contract the vacant lot adjoining the Oswego residence. The court awarded this lot to the husband. Although the lot was being bought in their names, the wife did not dispute that the husband had supplied whatever money was paid for it and testified that it was a "separate obligation" (apparently meaning separate from the obligation of the house itself).

A vacant lot in Arkansas standing in the joint names of the couple was awarded to the wife as well as several lots in Wisconsin, which were also in joint tenancy.

A confusing aspect of the property settlement decreed by the court was with regard to the funds in two savings accounts, one in the wife's name only in Appleton, Wisconsin, amounting to about $24,000, the other a joint savings account in a Cicero bank, the original amount of which was not clear from the testimony, but which at one time apparently had a substantial balance. The wife refused to divulge any information about the Appleton account. The husband testified he had supplied most of the funds in that account and that it had a balance at the time of the divorce of around $24,000 and that although the account was in his wife's name only, he had permitted this merely in order to preserve domestic peace by allowing her to deposit the funds in her already established Appleton account (she originally came from Appleton). He said, however, that he had never intended to make her a gift of such funds and it was regarded by both of them as a jointly owned fund. The wife, however, testified that the account never totaled more than $16,800 and that part of this money

was entirely hers from wages she earned before they were married and part of it was from the settlement of an insurance claim, due to an accident involving her two children by her previous marriage. There was testimony indicating that the insurance settlement was very nominal. The interest from such savings account indicated a balance of around $24,000 at the time of the divorce. The trial court suggested getting at the true source of the funds by contacting the bank, but the bank refused to divulge any information without the depositor's (the wife's) consent, which she would not give and which the court had no jurisdiction to compel the Appleton bank to disclose. The trial judge, after admonishing the wife that he would treat the funds as joint property unless she cooperated by revealing the source and true ownership thereof, treated these Appleton deposits as joint property. He gave the husband credit for $12,000 from this account.

At the same time the judge gave the wife the benefit of the doubt with regard to the savings account in the Cicero bank. The trial court was apparently as puzzled by the gyrations of this account as is this court. It appears from the exhibits that withdrawals from the savings account were made by both parties; however, the court found that approximately $6,000 had been withdrawn from this account by the husband and was unaccounted for. He, therefore, credited the wife with half of this sum—$3,000—against the $12,000 credited to the husband on the Appleton account and came up with a net difference of $9,000 in the husband's favor. To satisfy the husband for this $9,000 the trial court awarded jointly owned stocks of the parties to the husband, to that extent, any shortage to be made up from the wife's share of the proceeds of the sale of the Oswego house, when it was sold.

Neither side was satisfied with the trial court's decree. As indicated above, the wife appealed the judgment for divorce and the amount of child support and also the offset in the husband's favor in connection with the Appleton bank account. The husband contended the wife was not a fit person to have custody of the children and appealed that portion of the decree. He also said that the amount allowed by the judge for support was too much, that the granting of periodic alimony to the wife plus indeterminate possession of the Oswego house amounted to granting both periodic alimony and alimony in gross and that the trial court had no power to order the sale of the Clarendon Hills house and the application of its proceeds to the Oswego house mortgage and that the court had no power to order the sale of the jointly held stocks to the extent necessary to make up any deficiency in retiring the Oswego mortgage if the Clarendon Hills proceeds were not sufficient for that purpose.

■■ Before getting into the ramifications of the property disposition, we will consider the questions of divorce and custody. We think the trial

court was clearly correct in granting the divorce to the husband. His testimony as to the conduct of the wife was lucid and believable and must have been made entirely credible to the trial court by the irrational and improper behavior of the wife at the trial. The court at one point left the bench and took a recess in order to calm his anger over the arrogant and improper remarks of the wife, both off and on the stand. That the wife was guilty of mental cruelty is quite believable from the testimony on both sides and we have no hesitation in affirming the judgment of divorce on the ground of mental cruelty. It is plain from the testimony that the wife was unreasonable, if not irrational, in some of her judgments, and there was evidence she was not a good housekeeper and she was at times seemingly harsh, and at other times perhaps too lax, in dealing with the children. On the other hand, however, the husband was not in a position to take care of several small children, nor did he wish to take care of two of them, whom he did not acknowledge as his own. Moreover, the husband caused much of the family difficulty to begin with by delaying so long to provide more living space for a family consisting of husband, wife, several infants and two teenage stepdaughters. There is little doubt that this crowding contributed to the chaotic condition of the household which he testified to. His income during these years was apparently sufficient to have afforded more spacious living arrangements, had he wished to do so. It appears to us, therefore, that if the wife was at times irrational as to the character and habits of the husband—whom she characterized as being a homosexual and a racketeer—the husband was also, to some extent, selfish and unresponsive to the best interests of the children. Faced with this situation, we agree with the trial court's ruling that it was in the best interest of the children to leave the custody with the mother.

The affirmance of the trial court's rulings as to divorce and custody, however, does not by any means dispose of the difficulties of this case. There remains for our consideration both the justice of the awards and the jurisdictional power of the trial court in making the dispositions and arrangements as to marital property, which are set out in the decree.

■■ To begin with, we consider the contention raised by the husband that the court exceeded its power by awarding to the wife both periodic alimony and alimony in gross. The cases dealing with the question of alimony uniformly hold that both cannot be awarded (*Overton v. Overton* (1972), 6 Ill. App. 3d 1086; *Rich v. Rich* (1975), 24 Ill. App. 3d 1083). However, we do not agree that the provision of the decree whereby the wife was awarded possession of the Oswego house, until the youngest child attained age 16, was in the usual sense of that term alimony in gross. Both the Clarendon Hills house and the Oswego house were held in joint tenancy. It is not regarded as alimony in gross when one of the

parties is awarded one-half of the net proceeds of a jointly held marital home. The only difference here was that the house was not to be sold in this case and the net proceeds divided until the occurrence of the earliest of three events—remarriage of the wife; the wife voluntarily vacating the premises for 90 days, or the youngest child reaching age 16. While it might be argued that the exclusive possession of the Oswego house for a term of 12 to 14 years was, in effect, an award of alimony in gross, it is quite obvious that considering the minimal child support payments awarded, as well as the husband's ability to pay, the trial court was merely making sure that a permanent home was provided for the five minor children, rather than attempting to give the wife alimony in gross. Even technically the provision did not qualify as alimony in gross since alimony in gross is an award which is not affected by the wife's remarriage, where as the decree in this case provided it would terminate with the wife's remarriage and in any event at the time when the youngest child reached age 16. Alimony in gross, of course, is not affected by any subsequent event—it is final and complete. Since there was no property settlement agreement, the trial court's solution seems to be as equitable as possible, under the circumstances, bearing in mind the security and protection of the children which the court was striving to achieve.

Section 18 of the Divorce Act (Ill. Rev. Stat. 1975, ch. 40, par. 19) provides that:

> "When a divorce is decreed, the court may make such order touching the alimony and maintenance of the wife or husband, the care, custody and support of the children, or any of them as, from the circumstances of the parties and the nature of the case, shall be fit, reasonable and just and, in all cases, including default cases, the court shall make inquiry with respect to the children of the parties, if any, and shall make such order touching the care, custody, support and education of the minor children of the parties or any of them, as shall be deemed proper and for the benefit of the children. * * *"

We think the court had power, under this section of the Divorce Act, to make the provisions in the divorce decree with respect to the Oswego home, for the benefit of the children. See *Frank v. Frank* (1975), 34 Ill. App. 3d 957.

On the other hand, the trial court awarded the vacant lot, adjoining the marital home in Oswego, to the husband, even though it was being purchased in both their names. It was not a part of the marital home, the husband had furnished whatever money was paid on the lot, and it would have been difficult for the wife to have continued the payments. The equity of the wife was insignificant, under the circumstances, and we see

no injustice in allowing the husband to complete the payments and retain the lot in his own name.

■■ However, we think the trial court erred in awarding the lots in Wisconsin and the lot in Arkansas, which were in joint tenancy, to the wife, since the testimony was that the husband had supplied the funds for their purchase. The wife did not allege any special equities and indeed on the basis of special equities it would appear that the husband had more right to them than did the wife. We are of the opinion, therefore, that the court erred in awarding these lots solely to the wife.

■■ It is contended by the husband that the court acted beyond the power given it by the Divorce Act in ordering the sale of certain stock, jointly held by the parties. It is true that the trial court in a divorce action is not clothed with equitable powers but is limited to the authority conferred on it by statute. (*Smith v. Smith* (1929), 334 Ill. 370.) However, the court may adjust the equities of the parties in any property owned by them jointly. (*Podgornik v. Podgornik* (1945), 392 Ill. 124; *Altman v. Altman* (1974), 22 Ill. App. 3d 420.) The provision for the sale of the jointly held stock was tied in with the arrangement for the liquidation of the Oswego house mortgage and was an attempt by the court to adjust the equities so as to insure that the mortgage would be paid off and not foreclosed. It should be noted that the trial court went only so far in ordering the sale of the jointly held stock as was necessary to insure the payment of the mortgage. Any stocks not needed for this purpose or to insure the husband's credit of $9,000 from the Appleton bank account were to be divided in kind or disposed of by sale and distribution of the proceeds, presumably as the parties might agree between themselves. Again, therefore, the court was not attempting to exercise an unwarranted power of sale, but the power was such as was necessary to "adjust the equities" between the parties. The court's conscientious attitude in attempting to reimburse the husband for his expenditures in connection with the Oswego house mortgage and taxes, out of any available funds, also discredits the idea that the award of possession of the Oswego house to the wife, for a certain period of time, was in any way an award of alimony in gross. Given the peculiar circumstances of the case, the several minor children involved, and the unpredictability of the wife, the order for the sale of a portion of the jointly held stocks for the specific purpose of protecting the Oswego residence, while unusual, appears to us to have been a just and practical disposition, and within the court's power in reaching the equities as to the jointly held property.

Another controversial aspect of the trial court's division of the marital assets concerns its finding that the wife owed the husband a $9,000 credit from the proceeds of the Appleton bank savings account. The account

was admittedly in the name of the wife only and she contended the fund was her property alone, and even if most of the deposits in the account came from the husband, they were a gift and not joint property. The husband, however, contended he had allowed the deposits to be made in an already existing account in the wife's name just to preserve domestic peace, but that the funds all came from him and both parties understood the account was intended to be a joint one. Apparently the court concluded from the wife's evasiveness on this point and her refusal to allow the source of the funds to be traced and disclosed, that the husband was telling the truth as to the intention of the parties and he treated one-half of the funds as being subject to a resulting trust in the husband's favor. Since the wife admittedly had little or no income during the years when the account was being built up, it seems probable that the funds in question did come from the husband. The court's ruling that the fund was intended to be a joint one does not, therefore, seem to be inequitable.

There was also evasive and conflicting evidence on which the trial court based its finding that the husband had withdrawn approximately $6,000 from a joint savings account of the parties in a Cicero bank, and had failed to account for it, thus subjecting him to a debit of $3,000 in favor of the wife. This finding reflected the trial court's best judgment. We feel the court did everything in its power to reach an equitable result and upon examination of the evidence at hand we cannot say he was wrong in his conclusion. Since another trial on this point alone would not only be aggravating to the parties, but expensive in proportion to the $3,000 involved, we are not inclined to remand the case for reconsideration of this particular part of the decree.

■■ We find the trial court's award of attorneys' fees to the wife in the amount of $2,000 and $314.75 to be not unreasonable. The wife had some cash but little or no income and an uncertain future, whereas the husband owned a business and had an income of some $30,000 per year. The husband instigated the litigation and was successful in being awarded a divorce against the wife's wishes. We see no inequity in the ruling as to attorneys' fees under the circumstances.

At oral argument on appeal it was disclosed that there have been certain developments subsequent to the decree in connection with the minor children. As this is not a part of the record on this appeal, these events cannot be the basis for any decision here. If a post-decree motion, based on such subsequent developments is felt to be justified, it should be made by the party interested, before the trial court.

This was a complicated and tedious case, rendered even more difficult by evasive testimony, at times, on the part of both parties, and by the contumacious behavior, at times, of the wife. The trial court's patience was obviously strained, but it is apparent he proceeded throughout with

the best interest of the minor children in mind and attempted to apportion the property rights as equitably as might be done, within the practical limits of providing for dependent minors. It is a complicated decree because the situation of the parties was a complex one, but we believe the trial court patiently and conscientiously attempted to and did do justice between the parties.

There is no question in our minds as to the correctness of the trial court's ruling on the main issues of divorce and child custody.

As to the property division, as we have indicated above, we see no legal or equitable basis for the award of the Arkansas lot and the Wisconsin lots to the wife. A rational and just basis seems to exist otherwise for the dispositions made by the court and we are not inclined to disturb them and subject the parties and the trial court to another trial on these issues alone which, in our opinion, would not produce a more equitable result. Under Supreme Court Rule 366 (Ill. Rev. Stat. 1975, ch. 110A, par. 366) we exercise our prerogative to reverse that part of the decree awarding the Arkansas lot and the Wisconsin lots now standing in joint tenancy, to the wife. These lots should be retained in joint tenancy—we see no practical or equitable reason for the court to disturb the present ownership. We note that one lot in Wisconsin is presently in the wife's name only—this should not be disturbed. The parties, of course, may make such disposition of these lots between themselves as they may wish—it is not necessary for the court to decide this.

As so modified the judgment of the circuit court of Kendall County is affirmed.

Judgment affirmed as modified.

SEIDENFELD and GUILD, JJ., concur.