In re MARRIAGE OF LINDA S. WEAVER, Petitioner-Appellee, and JOHN P. WEAVER, Respondent-Appellant.

Fourth District   No. 4—84—0530

Opinion filed June 10, 1985.

Loren Thomson, of Bloomington, for appellant.

Robert J. Lenz, of Bloomington, for appellee.

JUSTICE MILLS delivered the opinion of the court:

A question of marital property.

This 11-year marriage was dissolved on April 15, 1981. John Weaver appeals from an order entered June 27, 1984, relating to the property distribution.

In sum, we reverse and remand.

The key issue on appeal relates to the assets of Abest, Inc. (Abest), a corporation wholly owned by John's parents. Abest was incorporated on April 4, 1969, approximately 19 months before the parties married. John's parents, Charles and Mary Weaver, were the sole stockholders of Abest.

John was the president of Abest, and Charles and Mary placed no restrictions or limitations on his use of the corporation. In April 1971, Charles and Mary created a trust which provided that all of the income of Abest would be paid to John. Charles testified that the purpose of the trust was to assure that all of the income from Abest went to John and none to Charles and Mary. The trust terminated by its own terms on April 1, 1981. Charles testified that no dividends were ever declared for Abest.

Charles Weaver testified that Abest was formed so that the businesses, Weaver's Rent-All and Weaver's Ready Mix, could be operated

as a corporation. Weaver's Rent-All was a partnership owned by Charles and Mary Weaver. Weaver's Ready Mix was a sole proprietorship owned by John.

John testified that in the latter part of 1968 several judgment creditors had claims against Weaver's Ready Mix and that he stopped operating the business at that time. Linda testified that John told her in 1972 that all of his property had to be in the corporate name because he had liens against it.

William Baltz, a former employee of Abest, testified that John told him in 1971 that several lawsuits had been filed against him during his operation of Weaver's Ready Mix and "instead of going bankrupt, he just started Abest, Inc., and just put everything, like, in his father's name, to keep the people from collecting on the liens." Baltz also testified that John told him he intended to "put everything back into his name" after seven years because the "liens would be up."

John testified that in addition to being president of Abest, he was the sole proprietor of A-Abest. A-Abest provided consulting services primarily for Abest. As president of Abest, John would hire himself as the sole proprietor of A-Abest to perform consulting work. He would fix the salary which Abest would pay for the consulting. John testified that since the dissolution of marriage, Abest has paid him consulting fees of $6,000. He admitted that he stated in an evidence deposition that the consulting fees were between $25,000 and $30,000; however, he stated that that figure was not correct.

During the marriage, the parties resided in a house near Bloomington. The house and land were in the name of Abest. Mortgage payments and taxes on the property were paid by Abest. The parties paid no rent except in 1972 and 1973 while they were being audited by the Internal Revenue Service. During those two years they declared $50 a month as income for the rental value of the premises.

In addition to owning the house and land, Abest also paid the electric bills, the fuel bills, the insurance on personal property, and the insurance on livestock owned by the parties. During the marriage, Linda's family car, a 1977 Chevrolet Caprice, was obtained in a trade for an airplane owned by Abest. When the car was fully depreciated on the corporate books, its title was transferred to Linda. Gasoline and maintenance for the family vehicles were paid by Abest. Abest also owned the washing machine in the parties' residence and the lawnmower.

In 1973, Linda began working for Abest and became its secretary-treasurer. Her duties included answering the phone, handling the payrolls, delivering parts and keeping the books. She "reconstructed" the

company books in preparation for an IRS audit in 1972 and 1973. She testified that after Abest was audited, she realized "that we had to keep the company and the—separate, because of all the liens and everything."

When Linda first began working for Abest, she did not draw a salary because the company was not making enough money. When money was available, she would write herself payroll checks according to the family needs. She set her own salary with John's approval. During 1983, John and Linda lived in DeRidder, Louisiana, while on a construction job. During this time, Linda was paid $1,500 per month as a salary although she did not work for Abest at that time. This money was used primarily for groceries and rent.

Michael Stanczak, a certified public accountant, stated in an evidence deposition that he examined the books and records of Abest and that as of December 31, 1980, the net worth of the corporation was between $254,070 and $365,018. Stanczak also stated that in 1974 the corporation had a negative net worth of $3,554.

At the time the judgment of dissolution was entered, the fair market value of the home in which the parties had lived was $65,000 to $70,000. Fair rental value was $350 to $400 per month. At the time of the hearing on the remaining issues in this case, the fair market value of the house was $100,000 and the fair rental value was $500 to $600 per month. Since the dissolution of marriage, John has resided in the house and has not paid rent.

Linda testified that at the time of the final hearing in the present case, she had a take-home pay of $800 to $900 per month. She had received a job offer with a starting pay of $20,000 per year in September 1983. However, the job was in Texas and required her to relocate there. She testified that she was not able to pay her attorney fees or the fees of Michael Stanczak.

John claimed that the only assets owned by him at the time of the dissolution were some furniture, some personal effects, and a 1981 Oldsmobile station wagon. He testified that his salary for Abest in 1982 was $20,000.

The trial court found that Linda's employment with Abest substantially appreciated the value of the business and that Linda was "entitled to a cash reimbursement from John Weaver of $100,000, and is awarded a judgment in that amount against John Weaver." The court further ordered John to pay Linda's attorney fees of $8,500. Custody of the parties' minor children was given to John. No child support was ordered and no maintenance was awarded to either party.

## I

John argues that the trial court erred in awarding reimbursement to Linda for her contribution to Abest.

The trial court characterized the $100,000 award as reimbursement to Linda for her contribution to John's nonmarital property. Although the court did not explicitly state in its order that Abest was the nonmarital property of John to which Linda contributed, this finding is fairly implied by the order and appears to be the only basis for granting the money award to Linda. The money was not distributed as marital property and no maintenance was awarded.

A spouse may be reimbursed for her contribution to nonmarital property under section 503(c)(2) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, par. 503(c)(2)). This section provides:

"When one estate of property makes a contribution to another estate of property, or when a spouse contributes personal effort to non-marital property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation; provided, that no such reimbursement shall be made *** in the case of a contribution of personal effort of a spouse to non-marital property, unless the effort is significant and results in substantial appreciation of the non-marital property."

It is clear from section 503 that reimbursement is for contributions to *nonmarital property.* John argues that because he did not actually own Abest, it could not be considered nonmarital property under section 503(c)(2).

There is no dispute that John's parents, Charles and Mary Weaver, were the sole shareholders and owners of Abest. The trial court found, however, that John had "control over and constructive ownership of Abest." The finding that John had "constructive ownership" of Abest is consistent with the evidence. He was free to operate the corporation as he willed. And as a practical matter, it appears that if John desired to have the assets of Abest transferred to him, his parents would have provided for it. However, the fact remains that John had no legal or equitable interest in Abest.

■ The trial court in a divorce action is not clothed with equitable powers but is limited to authority conferred on it by statute. (*Gray v. Gray* (1978), 57 Ill. App. 3d 430, 373 N.E.2d 317; see also *Stotlar v. Stotlar* (1977), 50 Ill. App. 3d 790, 365 N.E.2d 1097.) The Illinois Marriage and Dissolution of Marriage Act does not authorize the trial court to consider nonowned property as nonmarital property

under section 503. Linda has failed to provide us with any authority, either in the statutes or in case law, and has advanced no reasonable argument to support a holding that the trial court was authorized by statute to reimburse her for her contribution to Abest. We are constrained, therefore, to hold that the trial court erred in awarding Linda $100,000 as reimbursement for her contribution to Abest.

■ Linda's argument that the award can be justified on the grounds that John "worked a fraud upon her" by promising to convert the corporate assets to both their names is without merit. While Linda states several times throughout her brief that John promised to her that he would put Abest in both their names, she cites to nothing in the record which indicates such a promise was made. Linda's testimony that John told her he wanted her to work for the "family business" does not amount to a promise to place the assets of Abest in the names of John and Linda.

Moreover, there do not appear to have been any false statements made by John upon which Linda acted to her detriment. On the contrary, she was fully aware of John's scheme and even aided in the guise. Linda testified that she "reconstructed" the books when the parties were being audited by the IRS and she realized afterwards that she "had to keep the company and the—separate, because of all the liens and everything." She must now accept the consequences of her handiwork.

## II

■ John next argues that the trial court erred in awarding attorney fees to Linda in the amount of $8,500. John maintains that at the final hearing on the issues Linda only presented evidence of attorney fees in the amount of $7,400. He characterizes the additional $1,100 as "prospective fees," which have been held to be improper. See *In re Marriage of Justema* (1981), 95 Ill. App. 3d 483, 420 N.E.2d 796.

It is clear from the record that the trial court was not awarding prospective fees. The award of fees in excess of $7,400 was for the preparation and representation required for the final hearing on October 3, 1983. Linda testified that her bill for attorney fees did not include fees incurred for the final hearing. That this hearing required significant labor is evinced by the fact that the transcript of the hearing is 491 pages.

John next argues that the fees were improper because Linda failed to introduce evidence that she was financially unable to pay her fees. Section 508 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, par. 508) does not specifically require

such a showing. This section merely requires the trial court to consider "the financial resources of the parties." This court has held, however, that the allowance of attorney fees in a divorce proceeding must be based on a finding that one spouse is financially unable to pay the fees while the other is able to do so. *In re Marriage of Hopkins* (1982), 106 Ill. App. 3d 135, 435 N.E.2d 897; see also *In re Marriage of Edelberg* (1982), 105 Ill. App. 3d 407, 434 N.E.2d 440.

Our review of the record leads us to conclude that the trial court did not abuse its discretion in awarding attorney fees to Linda.

Because we have reversed the major portion of the trial court's property disposition, we reverse and remand with directions that the trial court dispose of the property in compliance with the Illinois Marriage and Dissolution of Marriage Act.

Reversed and remanded.

GREEN, P.J., and McCULLOUGH, J., concur.