AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO et al., Plaintiffs-Appellees, v. DANIEL WALKER, Governor et al., Defendants-Appellants.—(ILLINOIS ASSOCIATION FOR RETARDED CITIZENS et al., Intervenors-Appellees.)

(No. 12937;

Fourth District—April 24, 1975.

SIMKINS, P. J., dissenting.

William J. Scott, Attorney General, of Springfield (Douglas G. Olson, and Thomas H. Price, Jr., Assistant Attorneys General, and Ronald W. Olson, Special Assistant Attorney General, of counsel), for appellants.

Barbara J. Hillman and Gardner, Carton, Douglas, Chilgren, & Waud, of Chicago (Richard L. Menson, Ellen L. Fowler, of counsel), for appellees.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

This action was initiated by the American Federation of State, County and Municipal Employees, AFL-CIO, and its representative at Lincoln State School, Local 425; certain employees of Lincoln State School on behalf of themselves and all other employees of the school; and the parents of two residents of the school on behalf of themselves and all others similarly situated.

Defendants are Daniel Walker, Governor of the State of Illinois, Leroy Levitt, director of the Department of Mental Health; Lawrence Bussard, former superintendent of Lincoln State School for the Mentally Retarded; Paul Klockenga, acting superintendent of Lincoln State School for the Mentally Retarded; and Nolan Jones, director of personnel.

Briefs have also been submitted by the Illinois Association for Retarded Citizens, and Lincoln Parents Association for Retarded Children, Inc., intervenors, and by the guardian ad litem for the residents who were ordered separated.

This appeal is taken by the defendants from an order of the trial court granting the plaintiffs' motion for a preliminary injunction. This motion alleges that there is an undetermined number of residents at Lincoln State School who are "violence-prone." It is alleged that these residents have assaulted and injured other residents and the employees on a con-

tinual basis. The order granting the plaintiffs' motion required the defendants to segregate those residents who are determined to be violence-prone. It is from this order that defendants appeal.

The hearing on plaintiffs' motion for a preliminary injunction revealed that a number of residents and employees of Lincoln State School had been subjected to physical attacks, had been beaten, bitten, scratched, thrown against walls, and otherwise injured and intimidated. The evidence showed that such attacks and injuries were a frequent occurrence and were caused by a few residents. It will not be necessary for us to review the evidence concerning this violence in detail, because the defendants do not dispute that a small number of residents habitually and continually assault and injure other residents and employees. The primary issue raised at the hearing, and on appeal, does require us to review the testimony concerning the relief granted by the trial court, *i.e.*, segregation of violence-prone residents.

Ming-Chung Chen is a unit psychologist at Lincoln State School. He has a master's degree in educational psychology from the University of Illinois, a 1-year's internship in clinical psychology, and 1-year's post-master's study in psychology at Illinois State University. His duties at Lincoln State School included administering psychological evaluation on admission cases, program development, in-service training, and individual counseling and group psychotherapy. Testifying on behalf of the plaintiffs, he stated that, based on his experience, background, and education, there were a few residents at the school, who, because of their destructive behavior, required a special facility with trained personnel to deal with or to modify their behavior problem.

Dr. Robert Sprague, director of the Children's Research Center at the University of Illinois, testified for the defendants. The witness addressed himself to some problems that arise when segregation is used to limit physical assaults. He testified that among those segregated, there would be a tendency to emulate each other's violent tendencies, and, therefore, the situation would deteriorate. By removing the more violent residents, those who remain might become more assertive and more dangerous, that is, the so-called passive individuals, would set up a new "pecking order" of their own. This new order would not necessarily have the same number of physical attacks, but there would still be some attacks. Dr. Sprague also stated that once a resident is segregated, there is great difficulty in re-integrating him back into the institutional community. A further problem results in that it is difficult to determine who is to be placed in a segregated facility, and that there is a strong tendency to use such a facility as a "dumping ground" for undesirables. On cross-examination, Dr. Sprague was asked if segregation would be beneficial

to both those residents placed in the segregated facility and those remaining individuals left in the wards. The doctor stated:

"There is some initial short term gain; that is, initially this kind of facility, the immediate problems would certainly be helped, that is the immediate physical attacks would be reduced because the chief instigators are gone, but any time you look beyond the short term gains of, let's say, two to three months, then the disadvantages and the problems, at least in my experience, almost always outweigh the gains."

Later in his testimony, the doctor stated a 3-month period of segregation would reduce the number of attacks without severe adverse results in terms of the people who are separated. The facility used for these segregated residents should be large, the staff ratio should be high, and there should be additional supporting facilities such as physicians and social workers. He stated, however, that there would also be disadvantages during this 3-month period.

Dr. William Sloan, a former director of the Division of Mental Retardation of the Department of Mental Health, also testified for the defense. Dr. Sloan testified that the segregation of aggressive residents from passive residents was not completely without merit. He said that the solution did have defects that were self-defeating. The doctor specifically recommended a program whereby the aggressive residents would remain in their usual residential setting while also engaging in a special therapeutic program to modify their undesirable behavior. The doctor emphasized that the staff is the most important factor in treating these patients, and not where the patient lives. He stated that separation was not the important variable.

Following this hearing, the trial court entered an order granting a preliminary mandatory injunction. In this order, the court required that the defendants: (1) immediately identify those residents who are dangerous to others; (2) immediately separate such persons from the general population and place them in a suitable place under the control of the Department of Mental Health until the cause may be fully adjudicated; (3) insure that those separated be treated upon humane, as distinguished from punitive, considerations; (4) immediately recruit and hire such additional staff as is necessary to provide for the minimal legal and constitutional rights of all the residents affected; and (5) not create a jail-type facility at Lincoln State School to house those persons who are separated in accordance with the order.

In the instant case, defendants do not dispute the fact that there are a small number of residents of Lincoln State School who continually assault and injure other residents and employees. It is conceded that

irreparable harm has been inflicted in the past, and that such harm will likely continue in the future. Nor do the defendants dispute the existence of a constitutional right of persons in state institutions to be adequately protected from physical assaults. (See *New York Assoc. for Retarded Children, Inc. v. Rockefeller,* 357 F. Supp. 752 (E.D.N.Y. 1973); and *Gates v. Collier,* 349 F.Supp. 881 (N.D. Miss. 1972).) Thus, while agreeing that the trial court had the authority to protect the residents of Lincoln State School from harm, defendants contend that the trial court was without power to prescribe the specific mode of relief. Alternatively, defendants argue that any relief granted by the trial court had to be supported by expert testimony.

■■ The Department of Mental Health has been charged with the responsibility of caring for persons who are institutionalized at Lincoln State School. These persons are entitled, as a matter of law, to "* * * adequate and humane care and treatment." (Ill. Rev. Stat. 1973, ch. 91½, par. 12—1.) Neither this court, nor the circuit court of Sangamon County has the authority, much less the desire, to operate a State mental institution. Furthermore, courts are ill-equipped to take on such a task. However, it is within the particular province of the judicial system to insure that the constitutional rights of all citizens are protected. When, as here, constitutional rights are violated, judicial intervention is required. *Griffin v. County School Board,* 377 U.S. 218, 12 L.Ed.2d 256, 84 S.Ct. 1226.

The trial court in this case ordered, as a temporary solution only, the separation of violence-prone residents from the remainder of the institutional population. Defendants argue that while other courts have considered similar problems, often setting forth detailed requirements concerning size of staff, training, facilities, etc., they do not go so far as to prescribe the mode of treatment to be used in a specific instance. Primarily relied upon by defendants is *Wyatt v. Stickney,* 344 F.Supp. 387 (M.D. Ala. 1972), *aff'd sub nom., Wyatt v. Aderholt,* 503 F.2d 1305 (5th cir. 1974).

The *Wyatt* case, however, does not require us to find that the trial court abused its discretion in this case. Here the trial court was in a very different position from that of the court in *Wyatt.* There the trial court was aided in formulating its order. The parties, including the defendants, and amici, stipulated to constitutional minimum standards for treatment. In the instant case, the plaintiffs originally sought relief on June 18, 1974. The preliminary injunction was entered on November 1, 1974. During that interval, the defendants, although admitting that violence-prone residents had inflicted injuries on residents and employees of the school, apparently did nothing to alleviate the situation. At the pre-

liminary hearing, defendants did not attempt to deny or refute the evidence offered by the plaintiffs of specific instances of resident violence. There is no evidence in the record to show that defendants offered the court any alternative solution to separation. One defense witness did suggest the possibility of special staffing with only partial separation, but the Department of Mental Health never actually presented this to the court as a viable alternative. Because no direct alternatives were offered for its consideration by the defendants, the trial court was left with the implicit suggestion that nonviolent residents of Lincoln State School would just have to assume some risk of physical harm.

■■ The trial court could not stand by when constitutional rights were admittedly being violated. Relief was required. The only solution offered was that of separation. The court felt, for the short term at least, that separation would protect the residents of Lincoln State School from irreparable injury. It follows from this that the trial court did not abuse its discretion in ordering the separation of violence-prone residents from the general population of Lincoln State School.

Furthermore, defendants' objection to the court's ordering of a specific type of relief is not well founded. By ordering the violence-prone residents separated from the rest of the population of the school, the trial court was not prescribing a specific mode of treatment; the order of separation served only to free the nonviolent residents from risk of physical injury. Viewed in this light, the court has not abused its discretion.

Defendants also argue, and are joined in this contention by the intervenors, that the trial court erred in ordering separation without affirmative expert testimony to support the order. We disagree.

■■ Defendants' own witnesses admitted that separating the violence-prone residents would reduce the number of assaults and injuries suffered by the other residents and the employees without adversely affecting those separated, at least if used on a short-term basis. One of these witnesses testified that the most important factor in treating patients was not where the patient lived, but rather what kind of staff was provided. In addition, plaintiffs' witness, Ming-Chung Chen, believed that the violence-prone residents should be separated from the others if a special facility was provided. On the basis of this testimony, the trial court ordered that the aggressive residents not be put in a jail-type facility, and also ordered that additional staff be recruited and hired in order to provide the minimum legal and constitutional rights to all residents affected. For the purposes of a preliminary injunction, this evidence was sufficient to support the trial court's order. The fact that the ultimate relief in this case may not include separation does not render

the present action improper. *Hoffman v. Wilkins,* 132 Ill.App.2d 810, 270 N.E.2d 594.

An additional issue is raised by the guardian ad litem for the students who have been separated. The guardian contends that the order of separation violates these residents' constitutional and statutory right to treatment. The right to treatment has been established in a number of cases including *Wyatt v. Aderholt* and *Donaldson v. O'Connor,* 493 F.2d 507 (5th Cir. 1974).

The present state of knowledge concerning the treatment of the mentally retarded indicates that segregation is not presently favored. For example, in *Wyatt v. Stickney,* the court ordered that every attempt be made to move residents from segregated to integrated living; and in *New York Assoc. for Retarded Children, Inc. v. Rockefeller,* the court ordered that seclusion be prohibited at the institution involved. However, neither of these cases indicate what type of seclusion had been used in the past. Nor do these cases say that separation or segregation is always improper treatment or always unconstitutional. The order of the trial court in this case is careful to insure the rights of the separated residents. The order prohibits a jail-type facility and obligates the defendants to immediately recruit and hire such additional staff as is necessary to provide for the minimum and legal constitutional rights of all the residents affected. While there was testimony in the record that segregation can be counter-productive for both those segregated and those not so segregated, there was also evidence that a short term separation might be beneficial. Absent more specific evidence that the temporary separation ordered here violates the constitutional right of the mentally retarded to treatment, no such finding can be made. Therefore, the order separating the violence-prone residents did not violate their constitutional statutory right to treatment.

The final issue urged on appeal concerns the propriety of the trial court's modification of the preliminary injunction after the defendants had filed a notice of appeal from the original injunction. Defendants argue that the trial court was without jurisdiction to enter the order modifying the preliminary injunction.

■■ While it is true that the perfection of a notice of appeal ordinarily restrains the trial court from any further order which would change the judgment appealed (*Sunbeam Corp. v. Central Housekeeping Mart, Inc.,* 2 Ill.App.2d 543, 120 N.E.2d 362), it is also true that orders entered subsequent to the filing of a notice of appeal are valid if the substantive issues on appeal are not affected, and if the nature of the appeal is not altered. (*Shapiro v. Shapiro,* 113 Ill.App.2d 374, 252 N.E.2d 93.) That is the case here.

The subsequent modification of the preliminary injunction merely served to implement that order. This second order sought to protect the rights of all residents by ordering (1) the clinical determination to separate residents was to be made by the employees of the unit or ward who normally participate in staffing relating to such residents, plus a psychologist and other professionally trained staff as necessary; (2) the residents so separated were to be placed in a new physical environment within the grounds of the same institution, and such separation must be subject to periodic review; and (3) that the parent, guardian, or advocate of any resident who was so separated must be notified of such separation and be given the opportunity to challenge the decision.

■■ This modification of the preliminary injunction does not change the substantive issue on appeal, *i.e.*, whether the trial court abused its discretion in ordering a separation. Therefore, the trial court retained jurisdiction to implement its order granting a preliminary injunction to the plantiffs.

While it is clear that a great deal of evidence should be heard from all interested parties in this case before a final order is entered, we conclude that the trial court did not abuse its discretion in entering the preliminary injunction. The order is, therefore, affirmed, and the cause is remanded for further proceedings not inconsistent with this opinion.

Order affirmed, remanded with directions.

TRAPP, J., concurs.

Mr. PRESIDING JUSTICE SIMKINS, dissenting:

The order entered in the trial court is overbroad and too detailed in my view. There is no evidentiary basis to support portions of the order. There is, for example, no evidence that there are adequate facilities so that the violence-prone inmates may be placed in a new physical environment, nor is there any evidence that there are available funds with which to immediately recruit an additional staff. I have no disagreement with the premise that the residents and employees of the institution have a right to be protected from physical harm, and I further agree that some action, by the trial court, was warranted under the circumstances present here. However, I do not believe that the order should have been any more specific than to direct that all steps essential to the physical well being of the residents and employees were to be taken forthwith. The precise method of compliance with such a mandate is best left to those familiar with available resources. By approval of the specific, detailed order entered the court is, in fact, becoming intricately involved

in the management of the institution, and, I think, the treatment of its residents. The far-reaching implications of such a course are too apparent to detail. I therefor respectfully dissent and would reverse the order of the trial court.