*In re* MARRIAGE OF ANN LEVI LEGGE, Petitioner-Appellee and Appellant, and JOHN W. LEGGE, Respondent-Appellant and Appellee.

Fourth District   Nos. 4—82—0198, 4—82-0370 cons.

Opinion filed December 15, 1982.

Robert Broverman and Kenneth Podeschi, both of Robert Broverman, P.C., of Taylorville, for John W. Legge.

John R. Keith and John L. Swartz, both of Giffin, Winning, Lindner, Newkirk, Cohen & Bodewes, P.C., of Springfield, and Diane L. Brunton, of Carlinville, for Ann Levi Legge.

JUSTICE LEWIS delivered the opinion of the court:

This is a consolidated appeal from two orders entered by the circuit court of Macoupin County in a dissolution of marriage proceeding. Respondent appeals from the property division order, contending that a portion of the value of the marital home should have been assigned to him as his nonmarital property and that in any event, the award of the parties' entire interest in the marital home to petitioner was an abuse of the court's discretion. Petitioner appeals from an order dismissing her request for directions as to the payment of taxes and insurance premiums on the marital home during the pendency of this appeal and dismissing her motion for an award of attorney fees for defense of this appeal.

The evidence discloses that the parties were married on August 18, 1973. Two children were born of the marriage, who were ages seven and three at the time that the instant dissolution of marriage

proceeding was initiated.

Respondent is employed as a professor of mathematics at Blackburn College. His annual salary is approximately $21,994 and his take-home pay is about $1,228 per month. Over the past 11 years, respondent has also served as a part-time instructor at Lincoln Land Community College, where he earned $800 to $1,000 per semester. It is unlikely, however, that respondent will be able to obtain such part-time employment in the future.

During the course of the marriage, petitioner worked as a part-time bookkeeper, earning approximately $1,200 to $1,500 per year. She also worked as a part-time waitress while respondent was in Scotland on a sabbatical during the first half of 1978. At present, the petitioner is employed full time by the Central Illinois Steel Co. at a net weekly salary of $141. She also continues to do bookkeeping work on a part-time basis. Her 1980 gross earnings from the bookkeeping work were approximately $1,445.

When the parties were first married, they lived in an apartment in Carlinville until they purchased their first home in 1974. This home, which was owned in joint tenancy, was later sold for $32,800 and the proceeds applied to a new home which the parties constructed themselves on a lot which was owned by them as joint tenants with the right of survivorship and was first occupied by them in 1980. At the time the dissolution proceedings were initiated, the new home had an appraised value of $76,000, with an outstanding mortgage of $26,400. The monthly mortgage payments are $267.35.

The parties planned the new home together and performed a substantial amount of the construction work themselves. The petitioner helped prepare the floor plans and helped prepare and set the forms for the basement. She also assisted with the painting and roofing, helped finish the concrete work, and did most of the sanding and taping of the drywall and staining of the outside doors and interior baseboards. Furthermore, she prepared meals for all of the construction workers, which included members of both parties' families and their friends. Petitioner also contributed a $2,200 inheritance to the purchase of furnishings and construction materials for the home. Respondent prepared the blueprints for the home, engineered the electrical and plumbing systems, and personally supervised the construction on a daily basis by preparing work schedules for the construction crew. In addition, he devoted much physical labor to most aspects of the construction.

During the course of the marriage, the following amounts, which respondent contends constituted loans, were given him by his father

and expended for the purposes indicated:

| Date | Amount | Amount Repaid | Use |
|---|---|---|---|
| February, 1974 | $5,000 | $1,000 | Downpayment on first home |
| June, 1979 | 6,800 | 0 | Purchase of lot for new home |
| August, 1979 | 5,000 | 5,000* | Construction materials for new home |
| September, 1979 | 3,000 | 3,000* | Construction materials for new home |
| September, 1980 | 1,000 | 0 | Landscaping for new home |

*Repaid from proceeds of mortgage loan on second home.

Respondent's father also gave $5,000 to respondent's sister in February 1979. From respondent's father's viewpoint, this amount was given to his daughter for any particular purpose or use. While petitioner did not recall the transfer of $5,000 to respondent at that time as being a loan, respondent's sister and father testified that this transaction was a loan. There was, however, no written loan agreement; no interest was charged; and there was no agreement as to a repayment date. According to respondent and his father, the $6,800 which respondent received in June 1979 for the purchase of a lot for the new home was also a loan. Respondent's sister again received a like amount at the same time. The funds were purportedly given her for use as a downpayment on a home, but she did not purchase a residence until the summer of 1981 when she bought a mobile home for $10,000. She has not repaid any portion of the sums which she received in February 1974 or June 1979, although she eventually intends to repay these amounts to her father or have him come to live with her. Respondent, however, stated that the parties' second home was specifically designed so that his father could live there when he was no longer able to care for himself. According to petitioner, she offered to repay the $1,000 received from respondent's father in September 1980, but he refused to accept a repayment.

The parties agreed to a division of most of their personal property. The record contains little evidence as to the value of the property, but it appears that petitioner received a slightly larger share thereof than did respondent. (Respondent contended that petitioner received 70% of the household items.) Most of the items which petitioner received were of a type which would be useful to her in providing a home for the parties' children. The parties also agreed that petitioner would receive a 1974 Hornet automobile valued at $900, and

respondent a 1978 Volkswagen Rabbit worth $3,100. The only personal property in dispute was a Rockwell collection, a Masonic ring, and a dresser and bed in one of the children's bedrooms. The court found that the entire Rockwell collection, with the exception of four pieces, was petitioner's nonmarital property, which she had received as gifts from persons other than respondent during the marriage, and accordingy awarded that portion of the collection to her. The remaining four pieces were awarded to respondent. The Masonic ring was also awarded to petitioner, subject to respondent's right to use it until completion of his term as an officer of the Masonic lodge. The dresser and bed were awarded to respondent. The right to control two savings accounts, one of which was in the name of each of the parties' children, was also disputed, and the court awarded each party the right to control one of the accounts. The petitioner was awarded the marital residence, subject to the outstanding mortgage, and was ordered to hold respondent harmless for the amount thereof. Petitioner was also awarded custody of the parties' children subject to visitation rights on the part of respondent. Finally, respondent was ordered to provide petitioner with child support in the amount of $320 per month. Neither party was awarded maintenance or attorney fees.

## I

We first consider respondent's contention that a portion of the value of the marital home should have been allocated to him as his nonmarital property. As a basis for this contention, respondent relies principally on the considerable amount of physical labor which he devoted to the construction and planning of the home and his use of the money which his father gave him for the acquisition of the land on which the home was located and the construction and landscaping of the home. Section 503 of the Illinois Marriage and Dissolution of Marriage Act (MDMA) (Ill. Rev. Stat. 1981, ch. 40, par. 503) provides in pertinent part:

"(a) For purposes of this Act, 'marital property' means all property acquired by either spouse subsequent to the marriage, except the following, which is known as 'nonmarital property':

(1) property acquired by gift, bequest, devise or descent;

(2) property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise or descent;

(3) property acquired by a spouse after a judgment of legal separation;

(4) property excluded by valid agreement of the parties;

(5) any judgment or property obtained by judgment awarded to a spouse from the other spouse;

(6) the increase in value of property acquired before the marriage; and

(7) property acquired before the marriage.

(b) All property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage is presumed to be marital property, regardless of whether title is held individually or by the spouses in some form of coownership such as joint tenancy, tenancy in common, tenancy by the entirety, or community property. The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (a) of this Section."

Recently, in *In re Marriage of Rogers* (1981), 85 Ill. 2d 217, 422 N.E.2d 635, our supreme court rendered a definitive interpretation of the scope of subsection 503(a)(2) of the MDMA in the context of the use of nonmarital property for the acquisition of property held in joint tenancy by the parties to a dissolution of marriage proceeding. The court held that a marital home owned in joint tenancy is presumed "in fact" to be marital property, even if one spouse provided all the consideration for it from nonmarital funds. (85 Ill. 2d 217, 223, 422 N.E.2d 635, 638.) In our view, respondent has not overcome the presumption that he did not intend to retain any portion of the amount which he contributed toward acquisition and construction of the parties' marital home as his nonmarital property.

■ Respondent first alleges that evidence that the second home was specifically designed so that it could accommodate his father when he was no longer able to care for himself (in that it had extra wide halls and exterior ramps designed to accommodate a wheelchair) supports the proposition that the money received from respondent's father which has applied to the construction of the home and acquisition of the land on which it is situated was provided respondent with the expectation that respondent's father would be repaid for the money in the form of care at the parties' home during his old age. Therefore, respondent contends that the presumption of marital property has been negated with respect to the unpaid amount of the purported loans. The short answer to this contention is that even if respondent was under a binding obligation to provide his father with care in his old age as a result of receiving this money, this would only be probative of what was expected of respondent in exchange for this money; it would not be indicative of a desire on the part of respond-

ent that the amounts received from his father and expended for purposes of the acquisition and construction of the marital home be segregated as respondent's nonmarital property.

■■ Respondent also points to the following testimony as support for his position that a portion of the value of the marital home is his nonmarital property:

"Q. John, do you remember having any conversation with Ann about your father and the loans that he had made and asking Ann a question and what does my dad get out of this?

A. [Respondent] Yes.

I specifically asked Ann, she trying for a divorce, I was trying for a reconciliation. I said Ann what's my dad going to get out of all of this and she said he gets his money back if he wants it.

Q. When did you have that conversation?

A. I was standing at the front door of the house and she was on the first step.

Q. Was this the day she left?

A. No, it was about a week and a half later."

It is rather apparent that the statement of petitioner to which respondent referred in the above testimony was made in the course of a heated discussion, and for that reason alone it is of very limited probative value. A more important reason, however, for the failure of the statement to overcome the presumption that the entire value of the parties' marital home is marital property is that it is the intention of the parties at the time that marital property is converted into property held by them as joint tenants which is controlling *vis-a-vis* the status of the property. What the parties' feelings are toward the property after its conversion into joint tenancy property is of no significance whatsoever. Even if the above statement of petitioner could be interpreted as a manifestation of an intention that a portion of the value of the marital residence be reconverted to respondent's nonmarital property, the record contains no indication that she took any affirmative steps to effect such a reconversion.

■■ Finally, we deem respondent's contention that a portion of the value of the marital residence equal to the amount of labor which he expended in the construction and planning thereof should have been set aside as his nonmarital property to border on the frivolous. The record contains no indication whatsoever that he did not intend the physical labor which he expended on construction of the marital residence to accrue to the benefit of the marital estate. Since the record contains no other evidence which would negate the conclusion that re-

spondent did not intend all of the money and work which he contributed to the construction and acquisition of the marital residence to become marital property, we hold that respondent has not overcome the presumption that the entire value of the parties' marital home is marital property.

We next consider respondent's contention that all of the amounts given him by his father which were expended for purposes of acquiring the parties' second home were loans and that he is under an obligation to repay all such amounts for which he has not already reimbursed his father. The only relevancy of whether the payments of February 1974, June 1979, and September 1980 were, in fact, loans, to the issues with which we are here confronted is that if these amounts were in fact *bona fide* loans, they would constitute marital debts (which respondent was in effect ordered to assume) which would have to be taken into account in ascertaining the propriety of the property settlement ordered by the trial court.

■ There is conflicting evidence as to the status of these payments. On the one hand, there is the testimony of petitioner that she did not recall these transactions as being loans, and the evidence that no loan documents were signed, no interest was charged, and that on two occasions like sums were given to respondent's sister without her having made any repayments. Also, respondent's father refused to accept repayment of the amount given the parties in September 1980. Furthermore, the very fact that the amounts given respondent in August 1979 and September 1979 were repaid in full, while no portion of the amount given him in June 1979 had been repaid at the time of the initiation of the dissolution proceedings supports the view that the June 1979 transaction was not considered a loan by the parties. On the other hand, there is the testimony of respondent that these transactions were loans and the evidence that a partial repayment has been made of the amount received by respondent in February 1974. This conflicting evidence created a question of fact for the trial judge, who heard and observed the witnesses and was thus in the best position to assess their credibility. There is ample credible evidence to support his determination that the amounts in question were not *bona fide* loans, and this conclusion was thus not contrary to the manifest weight of the evidence. Therefore, none of the above amounts are entitled to recognition as marital debts in determining whether the property division ordered by the trial court was an abuse of its discretion.

We now turn to the question of whether the trial court erred in awarding petitioner the entire interest in the parties' marital home. Section 503(c) of the MDMA (Ill. Rev. Stat. 1981, ch. 40, par. 503(c))

provides as follows:

"(c) In a proceeding for dissolution of marriage *** the court shall assign each spouse's nonmarital property to that spouse. It also shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including:

(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and nonmarital property, including the contribution of a spouse as a homemaker or to the family unit;

(2) the value of the property set apart to each spouse;

(3) the duration of the marriage;

(4) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

(5) any obligations and rights arising from a prior marriage of either party;

(6) any antenuptial agreement of the parties;

(7) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(8) the custodial provisions for any children;

(9) whether the apportionment is in lieu of or in addition to maintenance; and

(10) the reasonable opportunity of each spouse for future acquisition of capital assets and income."

The requirement that property be divided in just proportions does not necessarily mean that an equal amount of the marital property must be awarded to each spouse in a dissolution of marriage proceeding. Disproportionate property allocations are appropriate where the economic circumstances and earning capacities of the parties are disparate. *Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, 429 N.E.2d 465; *In re Marriage of McMahon* (1980), 82 Ill. App. 3d 1126, 403 N.E.2d 730.

■■ Trial courts generally have a great amount of discretion in fashioning property dispositions in dissolution of marriage cases. A trial court's property allocation will not be set aside absent a clear abuse of its discretion. It has been stated:

"In determining whether the trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court but rather did the trial court in the exercise of its

discretion act arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceed the bounds of reason and ignore recognized principles of law so that substantial injustice resulted. This is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. It would seem that if reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 1127, 398 N.E.2d 126, 129.

The most cogent argument which respondent advances as to the purported impropriety of the property disposition order entered by the trial court is that instead of giving the marital home to petitioner outright, the court should have given petitioner only the right to live in the house until the youngest child attained a certain age, and directed that the house be sold at that time, with respondent receiving a share of the proceeds. This argument has some superficial appeal, but a close analysis reveals that the financial consequences of such an action would probably be of no greater benefit to respondent than the consequences of the property disposition which the trial court ordered, and that the possible collateral consequences of such an order would be contrary to one of the fundamental purposes of the MDMA.

■■ While it cannot be said that the marriage of the parties (which lasted eight years) was of a long duration, it nevertheless was not an inordinately short union. Throughout the course of the marriage, petitioner made substantial contributions as a homemaker, especially in caring for the two small children. Furthermore, there is some evidence that petitioner assisted respondent in his employment by grading papers, etc. It is also apparent that petitioner has a somewhat lower earning capacity than respondent. Those two factors are entitled to recognition in the property division, since a sufficiently large property allocation, as opposed to maintenance, is the preferred method of reimbursing a homemaker for her nonmonetary contributions to the marriage and for compensating for her generally inferior earning capacity. (See Ill. Rev. Stat. 1981, ch. 40, par. 504(a).) Under the property disposition which respondent suggests, petitioner would either be entitled to reimbursement for the mortgage payments made by her during her occupancy of the home or respondent would be required to make such payments in addition to child support and/or maintenance payments. Under the first alternative, petitioner would be entitled to a sizeable chunk of the proceeds of the sale of the home as reimbursement for the mortgage payments which

she had made and this, coupled with a possible entitlement on her part to the cost of major repairs performed upon the premises and insurance and tax payments made by her thereon, as well as a right to reimbursement for the physical labor which she expended upon the construction and planning of the home, would come close to consuming the entire proceeds from the sale of the home. Under this alternative, there would also be a possibility that the present financial burden on respondent would be greater in that he would have to make both child support and maintenance payments. Under the second alternative, the respondent would undoubtedly receive a larger share of the proceeds of the value of the home, but would face a heavier current financial burden in that he would be obligated to make both mortgage payments and possible child-support and/or maintenance payments.

Moreover, an arrangement whereby the home would continue in joint tenancy until, for instance, the attainment of majority by the youngest child, would be a potential source of constant friction between the parties. In that respect, such a disposition would be contrary to one of the fundamental purposes of the MDMA, which is to bring an end to the dissolution of marriage proceedings as quickly as possible, so that each party may have a fresh, independent start in life. See generally *Lee.*

■■ It is apparent that in fashioning the property disposition under review, the trial judge considered all relevant factors contained in section 503 of the MDMA and that he placed particular emphasis upon petitioner's contribution to the marriage as a homemaker; the desirability of awarding the marital home to petitioner, who has custody of the parties' children; petitioner's inferior earning capacity; and the fact that petitioner was not awarded maintenance. Respondent's sole continuing obligation is to provide child support in the amount of $320 per month. This leaves him with over $900 per month for his own use. He makes no contention that the amount of his income remaining after the payment of child support will afford him an inadequate standard of living. In fashioning its property disposition order, the trial court carefully considered the needs of all of the parties to this action, in view of petitioner's custody of the children, as well as all relevant statutory factors. The order will afford each party an adequate standard of living, while giving each an opportunity for an independent start in life, free from interference by or entanglement with the other party. We cannot, therefore, say that the court abused its discretion in awarding the marital home to petitioner.

## II

■ Following the filing of the court's property allocation order on March 5, 1982, respondent, on March 17, 1982, filed a motion for a stay of enforcement of the portion of the property disposition order pertaining to the marital home. This motion was granted on March 24, 1982, and respondent's notice of appeal was also filed on that date.

On May 14, 1982, petitioner filed a request for directions, alleging that certain real estate tax payments and insurance premiums on the marital home would probably become due before this court issued its decision in the instant case. The petitioner requested that the trial court order respondent to pay taxes and insurance premiums on the marital residence pending the conclusion of this appeal. On the same date, petitioner also moved for an award of attorney fees for defense of this appeal, contending that she was without means to afford the services of an attorney. Following a hearing, the circuit court dismissed the request for direction and the motion for an award for attorney fees, holding that it lacked jurisdiction to consider such matters during the pendency of this appeal. The petitioner appeals the trial court's dismissal of both of these motions.

Generally, the filing of a notice of appeal precludes the trial court from taking any action which would alter the portion of the judgment from which an appeal has been taken. (*American Federation of State, County & Municipal Employees v. Walker* (1975), 27 Ill. App. 3d 883, 327 N.E.2d 568; *Cygnar v. Martin-Trigona* (1975), 26 Ill. App. 3d 291, 325 N.E.2d 76.) A trial court may, however, determine matters unrelated to the portion of a judgment which is pending on appeal. (*Cygnar.*) In the present case, the payment by respondent of property taxes and insurance on the marital home would have involved a transfer of property by respondent for the benefit of petitioner. Contrary to petitioner's contention, we fail to see how the allocation of responsibility for such payments is collateral or unrelated to the issue on appeal in this case, which is the propriety of the trial court's property allocation. Assignment of interim responsibility for such payments would definitely have altered the property allocation scheme under review by us.

We note that in the present case, the trial court's stay order is applicable only to the execution of the deed conveying the marital home from the parties as joint tenants to petitioner as the sole owner. It is inapplicable to petitioner's right to possession of the home. The proper course of action would thus have been for petitioner, who was entitled to possession of the home throughout the pendency of this ap-

peal, to make the tax and insurance payments. If we had decided to reverse the trial court's property disposition, the payments which petitioner had already made could, of course, have been given appropriate consideration in fashioning a new property disposition in conformity with our decision. We therefore hold that the trial court did not err in dismissing petitioner's request for directions.

We finally consider the petitioner's contention that the trial court erred in dismissing her motion for a prospective award of attorney fees for defense of this appeal. Section 508(a) of the MDMA provides in part:

> "The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order either spouse to pay a reasonable amount for his own costs and attorney's fees and for the costs and attorney's fees necessarily incurred by the other spouse, which award shall be made in connection with the following:
>
> * * *
>
> (3) The defense of an appeal of any order or judgment under this Act, including the defense of appeals of post-judgment orders." (Ill. Rev. Stat. 1981, ch. 40, par. 508(a)(3).)

There is a split of authority as to whether a trial court may properly make a prospective award of attorney fees for defense of an appeal pursuant to the above statutory provision. Both first and third districts have held that a trial court may properly make such an award. (*In re Marriage of Theeke* (1981), 105 Ill. App. 3d 119, 433 N.E.2d 1311; *In re Marriage of Giammerino* (1981), 94 Ill. App. 3d 1058, 419 N.E.2d 598; *In re Marriage of McBride* (1981), 102 Ill. App. 3d 84, 429 N.E.2d 867.) The second district, however, has held that a trial court may not make a prospective award of attorney fees for defense of an appeal in a proceeding under the MDMA. (*In re Marriage of Pease* (1982), 106 Ill. App. 3d 617, 435 N.E.2d 1361.) Formerly, both the first and third districts also espoused this view on the prospective award of attorney fees issue. See *In re Marriage of Wright* (1981), 92 Ill. App. 3d 708, 415 N.E.2d 1196; *In re Sharp* (1978), 65 Ill. App. 3d 945, 382 N.E.2d 1279.

■ We feel that the better position is that a trial court does not have jurisdiction to make a prospective award of attorney fees for defense of an appeal in a dissolution of marriage proceeding while the appeal is pending. An analysis of this issue must, of course, begin with the premise that absent an explicit statutory exception, a trial court may not enter an order which would alter a decision under review after the jurisdiction of the appellate court has attached. (See

*Walker; Cygnar.*) Prospective attorney fees awards can have just that effect, for they involve the transfer of property by one spouse for the benefit of another and can thus significantly alter the property aspects of a dissolution of marriage order. The Divorce Act specifically permitted the award of prospective attorney fees for defense of an appeal (Ill. Rev. Stat. 1975, ch. 40, par. 16), but the MDMA contains no such provision.

■■■ Moreover, we agree with the *Pease* court that the propriety of attorney fees awards for legal services to be performed in the future is difficult to review on appeal. When such a fee award is made and contentions are raised on appeal as to the correctness of the amount thereof, there can obviously be no evidence in the record relative to such matters as the amount of time actually expended in defending the appeal or the propriety of the fee in relation to the result obtained. Thus, a well-founded determination by the appellate court of the propriety of such a fee award would necessarily require the appellate court to receive evidence which had not previously been presented to a trial court. Such a practice is unknown in any other type of proceeding, and statutory language of the most specific variety would be required to support this practice with respect to a prospective award of attorney fees for defense of an appeal in a dissolution of marriage case. Such language is simply not present in the MDMA. Therefore, we hold that when a party desires an award of attorney fees for defense of an appeal pursuant to section 508(a)(3) of the MDMA (Ill. Rev. Stat. 1981, ch. 40, par. 508(a)(3)), a motion for such a fee award must be made in the trial court after the conclusion of the appeal.

For the foregoing reasons, we affirm the orders of the circuit court of Macoupin County awarding the parties' marital home to petitioner and dismissing petitioner's request for directions and motion for a prospective award of attorney fees for defense of this appeal.

Affirmed.

TRAPP and GREEN, JJ., concur.