*In re* MARRIAGE OF RODNEY W. DRUMMOND, Petitioner-Appellee, and JULIA A. DRUMMOND, n/k/a Julia A. Frawley, Respondent-Appellant.

Fourth District   No. 4—86—0629

Opinion filed June 8, 1987.

Anthony P. Corsentino, Ltd., of Peoria, and Susan Butler, of Morton, for appellant.

Kim L. Kelley, of Peoria, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

The parties, Rodney W. Drummond (husband), and Julia A. Drummond (wife), were married on August 14, 1981. On May 15, 1984, husband filed a petition for dissolution of marriage. On December 26, 1985, the circuit court of Woodford County entered a judgment of dissolution of marriage specifically reserving issues of permanent custody, child support, maintenance, distribution of property, and attorney fees. The case proceeded to trial on these remaining issues, and on June 27, 1986, the court entered its order which provided for joint custody of the couple's minor child, distribution of marital property, and denial of attorney fees and permanent maintenance. Following denial of her petition for clarification, and post-trial motion, wife appeals the order of the trial court.

Wife alleges six areas of error for our consideration upon review: (1) the joint-custody order; (2) the award of partial custody to hus-

band; (3) distribution of marital property; (4) attorney fees; (5) evidentiary rulings at trial; and (6) denial of her motion for reconsideration. We affirm in part, reverse in part, and remand.

The parties married in August of 1981. At the time of marriage, wife had joint custody of two children from a previous marriage. Consequently, wife's children, Ben, age 10, and Stacee, age 7, occasionally resided in the marital home. In October of 1981, Ben and Stacee moved into the marital residence on a permanent basis.

The trial court record from the second part of the bifurcated dissolution proceedings is replete with contradictory evidence. Wife maintains that husband was mentally and emotionally abusive to her children. Husband, however, who claims that while he was initially shocked when the children moved in permanently, without notice, maintains that he often cared for the children, assisted them with homework, and planned family outings.

In December of 1981, wife became pregnant, giving birth to Joshua Drummond in 1982. Wife testified that husband did not assist in the care and upbringing of Joshua. Husband, however, claimed that he was thrilled by the birth of his son and took an active part in caring for the infant.

There was a great deal of evidence adduced regarding wife's physical problems and her abuse of prescription medication. Husband introduced into evidence a summary of wife's prescription records for a 3½-year period. The list included a wide variety of drugs, the majority of which were psychotropic and addictive agents. Wife admitted taking all of these drugs and additionally noted that the list was not all-inclusive of the prescriptions she obtained during that period of time. Wife further stated that she often combined different drugs from separate physicians without seeking any doctor's advice.

The ingestion of these drugs affected wife's ability to care for her home and her family, especially Joshua. Husband, who witnessed wife's mixing of various prescriptions, stated that wife acted sluggish, drowsy, and incoherent on numerous occasions. Husband testified about one particular incident where wife staggered down a flight of stairs and walked directly into a wall, collapsing to the floor. At the time of this incident, wife was caring for Joshua, which caused husband great concern. Mr. Robert Knudsen, a friend and business associate of husband, corroborated this particular incident.

At trial, wife candidly admitted fabricating physical ailments. Wife told a number of people that she was suffering from an aneurysm of the vessel of the brain. Wife also informed husband and husband's grandmother that she only had one kidney, which required her

to undergo dialysis treatment. Wife's physician confirmed that wife was physically healthy and had only been treated for migraine headaches.

Husband presented substantial evidence of wife's poor housekeeping capabilities. Robert Knudsen testified that he visited the Drummond residence for extended periods on numerous occasions and that the house was always a mess, with much "disarray and confusion." Knudsen said that dishes were undone, the refrigerator often contained moldy food, toys and clothes were scattered everywhere, and dirty clothes and diapers were piled up. Knudsen noted that wife would often leave the home for extended periods of time to bowl or play volleyball, leaving husband to clean, cook, and care for the three children.

Husband introduced into evidence a series of 36 pictures depicting the condition of the house. The pictures show molding food in the refrigerator, dirty dishes, uneaten food left out in accessible and open areas of the kitchen, garbage on the floor, and clothes scattered throughout the house. The pictures were allegedly taken over a period of time in early 1984 prior to her husband's filing for dissolution. Wife did admit that she "was less than perfect" with respect to the upkeep of the home. Wife claimed, however, that she experienced many medical problems and a great deal of stress during the early part of the marriage.

Husband testified that he relocated to Texas in September of 1984 due to a promotion. At the time of trial, husband's salary was approximately $2,400 per month. Since the move, husband has arranged for Joshua to visit him on eight separate occasions. Husband incurred all the expense of these trips, totalling in excess of $7,000. Husband maintains that he has a good relationship with his son, is very involved in his son's emotional and intellectual development, and that his son enjoys the trips to Texas. Husband admitted that his work requires him to travel away from home, but stated that he also has discretion in establishing his work schedule. Husband testified that he is better able to provide a stable home environment for Joshua and would hire a full-time nanny to assist him.

At trial, an issue arose regarding the admissibility of certain evidence concerning an "alleged" homosexual relationship of husband. The issue arose when wife asserted that Joshua had reported seeing his father kiss Robert Knudsen. These allegations were raised by wife in the midst of trial. Counsel admitted to the court that he had no evidence of any alleged homosexual activity by husband. The very next day, wife again brought this matter to the attention of the court. The

trial court then appointed a guardian *ad litem* and ordered that Joshua be interviewed by two mental health professionals.

Dr. Brody, a psychiatrist, determined that the child may well have been prompted or coached in making these assertions and, in any event, the statements were not reliable. Dr. Leone C. Legan, a psychologist who examined Joshua, found the story was "contrived and embellished to placate and please others." The guardian *ad litem*, Mark J. McGrath, concluded that the child had been prompted or coached into making such statements. The court determined that there was no credible, reliable, or admissible evidence regarding this issue and denied any testimony in that respect.

Wife presented a great deal of character evidence. Several witnesses testified that wife is a responsible person who works well with other individuals. Two individuals specifically stated that they had been present in wife's home, which was clean, orderly, and well kept. They further stated that the children interacted well, were extremely polite, and very obedient. Both Stacee and Benjamin testified at trial. They both expressed their love for and companionship with Joshua.

Wife's mother, Margie Nelson, testified that she assists wife with the care of Joshua, cooking, and cleaning. Nelson stated that wife was under a great deal of stress during the marriage, but has undergone a complete turnaround since the separation. In addition to changes in her housekeeping habits, Nelson noted that wife is working full time and is actively involved in the church.

Terry Carmichael, a child-welfare worker with the Department of Children and Family Services, testified that he visited wife in her home in October of 1985. Carmichael was ordered by the court to conduct a custodial investigation. He stated that he found the home to be clean and orderly. Carmichael determined that wife was a fit and proper parent for Joshua. He saw no disadvantages to wife having custody of Joshua, specifically noting that all three children were emotionally stable and well provided for. Carmichael did admit that he had not met wife prior to October of 1985 and that his evaluation was based in large part upon wife's statements made to him.

During trial, wife attempted to establish that husband physically abused her. Wife introduced a series of photographs depicting bruises on her arms, legs, and torso. Evidence later indicated that the parties became involved in a physical altercation in May of 1984. It was unclear how the dispute arose and who was the initial aggressor. Both parties, however, did admit to physical violence.

Wife additionally testified that financial problems permeated the marriage. Both prior to and during marriage, husband was involved in

commodities trading. He testified that at one point in time, he lost in excess of $14,000 dealing in the market. Wife testified as to several loans taken by husband on the pretext of home improvement or vacationing purposes, but used to buy stock or pay margin calls and losses generated by his trading in the commodities market. Husband acknowledged using loan proceeds for investment, but only to a limited extent.

Several experts testified in this case. Karen Howard Brody, M.D., a child psychiatrist, prepared a report dated January 21, 1986, which was received into evidence. The doctor found that Joshua is a "delightful, healthy, well-adjusted three-year-old." She found no indication that being in wife's custody has been "anything but beneficial to Joshua." Joshua's play therapy depicted a family situation in which the primary caretaker and the parent with whom the children principally interacted was the mother. She believes that Joshua has a very close attachment to his brother and sister, particularly Stacee, and that he enjoys the activity and stimulation provided by the older children. According to Brody, residing in Illinois has an additional bonus in terms of the consistent and regular contacts with both sets of grandparents and his paternal great-grandmother. The doctor believed the extended family has been an important source of support and will help Joshua continue to grow.

Dr. Brody met with husband on two occasions. She indicated that husband displayed a genuine concern in developing a close relationship with his son. With respect to the wife, Dr. Brody also testified that she saw wife progress from a state of emotional upset occasioned by the breakup of her marriage to "a self-contained and self-assured, mature, competent woman." The doctor noted that wife has established herself in a sound job and has moved with her children into their own home. The doctor encouraged liberal visitation for husband with Joshua, noting husband's genuine concern to develop a close father-son relationship. It was Dr. Brody's ultimate conclusion that Joshua should not be uprooted and should remain in his mother's primary care.

Leone Legan, of Psychological Associates, conducted psychological evaluations of wife, husband, and Joshua. She found husband to have responded to the psychological testing "in a manner which maximizes his positive qualities, and projects himself as a scrupulous and conscientious individual." Legan found wife to be fit, indicating "adaptability, good ego strength, and a positive self-image." The psychological evaluation of Joshua indicated that he was a "neat, well-groomed youngster, demonstrating appropriate levels of motor coordination,

and social responsiveness." Joshua demonstrated affection to both parents and Legan noted that "his parenting appears to have been effective and appropriate." The home evaluations of husband's home in Keller, Texas, and of wife's home in Washington, Illinois, indicated that both homes were appropriate and that both individuals have the motivation, means, and resources to provide for the child.

In the spring of 1985, husband and wife underwent family mediation. Sandra Mills, a family mediator, met with the parties on four occasions, during which the focus was upon communication and cooperative parenting. The parties initially established a list of issues agreed upon in raising Joshua. Specific areas included: daily care, visitation, religion, health care, education, remarriage, cooperation, and cohabitation. In a letter to the court dated June 11, 1985, Ms. Mills noted that "Visitation will continue to be a struggle. Both parties are extremely concerned with issues of control."

On June 27, 1986, the court entered its order. Noting that both parents are fit and able to provide sufficient care, the court stated that the evidence suggested that husband was the better parent. Additionally, the court recognized the need for a continued close association with Ben and Stacee as well as the grandparents. Consequently, the parents were awarded joint custody with each party to provide support while the child is in his care.

The court deemed the residence in Germantown Hills to be nonmarital property and awarded the money from its sale to husband. The $2,000 advance from the sale of the home and $657 advanced to wife for car repairs were confirmed as temporary maintenance. The court found wife able to support herself and, as such, there was no need for permanent maintenance. Finally, the court ordered that each party be responsible for their own attorney fees.

Wife contends that the trial court's joint custody order is not in compliance with the applicable provisions of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (Ill. Rev. Stat. 1985, ch. 40, par. 101 *et seq.*). Since the court did not specifically incorporate any type of "joint parenting agreement" nor did the court make any provisions for dispute resolution in the event of conflict, wife maintains the order cannot stand. We must agree.

The joint-custody provisions of the IMDMA, effective January 1, 1986, provide for an order of joint custody pursuant to a "joint parenting agreement or a joint parenting order" which shall be produced by the parents. (Ill. Rev. Stat. 1985, ch. 40, par. 602.1(b).) Section 602.1(b) further provides:

"Such Agreement shall specify each parent's, powers, rights

and responsibilities for the personal care of the child and for major decisions such as education, health care and religious training. The Agreement shall further specify a procedure by which proposed changes, disputes and alleged breaches may be mediated or otherwise resolved and shall provide for a periodic review of its terms by the parents. In producing a Joint Parenting Agreement, the parents shall be flexible in arriving at resolutions which further the policy of this State as expressed in sections 102 and 602. For the purpose of assisting the court in making a determination whether an award of joint custody is appropriate, the court may order mediation and may direct that an investigation be conducted pursuant to the provisions of Section 605. In the event the parents fail to produce a Joint Parenting Agreement, the court may order an appropriate Joint Parenting Order." (Ill. Rev. Stat. 1985, ch. 40, par. 602.1(b).)

Additionally, the IMDMA states that a joint-custody order may only be entered where it is "determine[d] that joint custody would be in the best interests of the child." Ill. Rev. Stat. 1985, ch. 40, par. 602.1(c).

■ Traditionally, a joint-custody order consists of an arrangement whereby both parents retain custody of the child and jointly participate in reaching major decisions affecting the child's welfare. (See 17 A.L.R.4th 1013(1982); Scott, *Joint Child Custody—An Exception*, 64 Chicago Bar Record 406 (1983).) The propriety of such an arrangement is dependent upon the following: the best interests of the child, agreement of the parents and their mutual ability to cooperate, geographic distance between the parents, desires of the child if of a suitable age, and the relationships previously established between the child and his parents. Since joint custody requires extensive contact and intensive communication, it cannot work between belligerent parents. Scott, *Joint Child Custody—An Exception*, 64 Chicago Bar Record 406 (1983).

This court, in the case of *In re Marriage of Manuele* (1982), 107 Ill. App. 3d 1090, 1094, 438 N.E.2d 691, 694, discouraged the awarding of joint custody, specifically noting that such orders are usually unworkable and should be rarely entered. We then proceeded to state:

. "Our conclusion that joint or divided custody should rarely be awarded is supported by the substantial weight of authority from other jurisdictions. (*Beck v. Beck* (1981), 86 N.J. 480, 432 A.2d 63; *Mastropole v. Mastropole* (1981), 181 N.J. Super. 130, 436 A.2d 955; *In re Marriage of Neal* (1979), 92 Cal. App. 3d

834, 155 Cal. Rptr. 157; *Braiman v. Braiman* (1978), 44 N.Y.2d 584, 407 N.Y.S.2d 449, 378 N.E.2d 1019; 24 Am. Jur. 2d *Divorce and Separation* sec. 799 at 907 (1966); 27B C.J.S. *Divorce*, sec. 308(d), at 446 (1959).) In *Beck*, the court approved the divided custody but cautioned that such an award should seldom be made. In the other cited cases, the award was set aside with the court emphasizing the split authority would likely lead to dispute between the parents unless the parents had a very strong ability to cooperate."

Finally, we noted that unless parents have an unusual capacity to cooperate, substantial disagreement shall arise, ultimately resulting in harm to the child. As a result, in *Manuele*, we reversed and remanded the cause with specific directions to have custody vested in one parent subject to visitation. *In re Marriage of Manuele* (1982), 107 Ill. App. 3d 1090, 1095, 438 N.E.2d 691, 695.

The rationale of *Manuele* was reiterated and adopted in *In re Marriage of Pool* (1983), 118 Ill. App. 3d 1035, 455 N.E.2d 887. The court noted that the parties, who had been awarded joint custody, had failed to show any willingness to cooperate. Consequently, the court reversed and remanded the case with directions to place the children with one parent subject to visitation by the other. *In re Marriage of Pool* (1983), 118 Ill. App. 3d 1035, 1038, 455 N.E.2d 887, 889.

Subsequent to our holdings in *Manuele* and *Pool*, the legislature enacted section 602.1(b), which provides strict guidelines which must be adhered to prior to an award of joint custody. (Ill. Rev. Stat. 1985, ch. 40, par. 602.1(b).) These statutory prerequisites evidence an intent that joint custody only be awarded where circumstances indicate that the parents are willing to cooperate in the upbringing of their children.

■ Holding in accordance with the policy enunciated in *Manuele* and *Pool*, the joint-custody order is in error. Additionally, the order was not in compliance with statutory requirements. There was never a joint-parenting agreement made by the parties or entered by the court. Although the parties did undergo family mediation and initially established some issues agreed upon in raising Joshua, mediation was ultimately ceased as the parties were "stalemated." The mediator, in a letter to the court, specifically noted that "visitation would continue to be a struggle. Both parents are extremely concerned with issues of control." Testimony presented at the trial indicated that the parties were unwilling to cooperate and quite vindictive toward each other. Additionally, the trial court failed to note the geographic distance between the parents. Wife currently resides in Washington, Illinois,

while husband is living in Keller, Texas. Under these circumstances, the trial court abused its discretion in making a joint-custodial award.

■■ Although the court awarded "joint custody," husband was given custody during the school year with visitation rights accorded wife during summer vacation, Christmas, and in the spring. Wife maintains the trial court's decision is not in accord with the evidence and the best interests of Joshua will only be served by awarding sole custody to her.

In determining custody, the primary consideration is the best interests and welfare of the child. (*Cooper v. Cooper* (1986), 146 Ill. App. 3d 943, 497 N.E.2d 805; *In re Marriage of Stuart* (1986), 141 Ill. App. 3d 314, 490 N.E.2d 243.) Section 602 of the IMDMA (Ill. Rev. Stat. 1985, ch. 40, par. 602) requires that the court consider all relevant factors in determining custody. Custody matters are within the discretion of the trial court because it is in the best position to hear and evaluate evidence. (*In re Marriage of Ramer* (1980), 84 Ill. App. 3d 213, 405 N.E.2d 401.) Consequently, the decision of a trial court will not be disturbed upon review unless it is against the manifest weight of the evidence or it is manifestly unjust. *Cooper v. Cooper* (1986), 146 Ill. App. 3d 943, 497 N.E.2d 805.

The court is statutorily mandated to determine custody in accord with the best interests of the child, considering the following:

"(1) [T]he wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved; and

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person but witnessed by the child." (Ill. Rev. Stat. 1985, ch. 40, par. 602.)

Additionally, the court is not to consider conduct of a present or proposed custodian that does not affect his relationship to the child. Ill. Rev. Stat. 1985, ch. 40, par. 602(b).

In this case, as previously indicated, all of the evidence presented at trial was contradicted. Husband and wife presented completely different versions regarding the care and upbringing of Joshua. Each

parent fought viciously and vindictively in an attempt to obtain sole custody of Joshua.

Evidence did establish that wife provided a stable family atmosphere. Joshua had come to accept Ben and Stacee as his brother and sister. The children often played together and Stacee, in particular, expressed much affection towards Joshua. These relationships were borne out by the psychological evaluations of Joshua and wife. Additionally, Joshua experienced much contact with members of wife's extended family. Joshua's grandparents played an active role in the care and development of the child.

Husband, who had moved to Texas subsequent to separation, also remained actively involved in Joshua's continuing care and development. Husband expended much time and money to maintain frequent contacts with his son. Husband expressed his desire to raise his son and had established a stable household in Texas for him.

Reports from four experts evaluating the family were presented to the court. In a letter dated February 13, 1985, wife was evaluated by John M. Troyer of Lutheran Social Services. In his evaluation, Troyer indicated that wife was qualified and had the desire to be the sole custodian of her son, Joshua.

Prior to trial, the court ordered a custodial investigation. In a report dated November 14, 1985, Terry Carmichael, a child-welfare worker with the Illinois Department of Children and Family Services, indicated that wife was a proper parent for Joshua's custody. Carmichael noted that he based his evaluation on his perception of the home, wife's interaction with the children, and his interview of wife. Carmichael concluded by stating that the children were emotionally stable, well provided for, and that wife would be the proper custodial parent.

In an evaluation dated January 8, 1986, the Texas Department of Human Services presented conclusions regarding husband. In the report to the court, Todd Maslow, contract investigator, recommended that husband was able to provide a stable and nurturing home for Joshua. Maslow concluded by recommending husband be given every consideration regarding the placement of his son.

Wife underwent an evaluation by Dr. Karen Brody, M.D., a specialist in child, adolescent and family psychiatry. In an evaluation dated January 21, 1986, Brody recommended that Joshua remain with his mother. Specifically noting the importance of the family situation, Brody noted that Joshua would benefit from the activity and stimulation of the company of the other children as well as the grandparents.

While much of the evidence was contradicted and emotionally bi-

ased, the opinions of the experts were clear. Only husband's evaluation by the Texas Department of Human Services favored placement with husband. The Texas investigator, however, expressly noted that he had no "first-hand knowledge of the mother and her circumstances." The report went on to recommend that husband "be given every consideration regarding placement."

■ Every other expert recommended that Joshua be placed with wife. Even the court-ordered custodial investigation recommended placement with wife. It was clear that wife not only provided a stable home environment, but had the added support of her extended family. In this respect, the trial court's custody determination awarding husband Joshua for the entire school year was against the manifest weight of the evidence presented.

■ Wife next argues that the court erred in failing to recognize husband's losses from commodities trading as dissipation of marital assets. Wife maintains that she should have received a compensating payment from husband's income to offset his depletion of the marital estate.

Dissipation of marital assets by one spouse in contemplation of dissolution of marriage is an unacceptable practice. (*In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 448 N.E.2d 545.) Section 503(d)(1) of the IMDMA (Ill. Rev. Stat. 1985, ch. 40, par. 503(d)(1)) specifically states that the trial court, in dividing the marital property, must consider the dissipation of value of the marital and nonmarital property. Dissipation may be found where spouse uses marital property for his or her own benefit and for a purpose unrelated to the marriage at a time when the marriage relationship is in serious jeopardy. *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 462, 426 N.E.2d 1087, 1094.

Whether a given course of conduct constitutes dissipation within the meaning of the IMDMA depends upon the facts of the particular case. (*In re Marriage of Siegel* (1984), 123 Ill. App. 3d 710, 463 N.E.2d 773.) Upon review, the trial court's division of property pursuant to the IMDMA shall stand absent an abuse of discretion. (*In re Marriage of Legge* (1982), 111 Ill. App. 3d 198, 207, 443 N.E.2d 1089, 1096.) The determination of an abuse of discretion does not turn upon whether the reviewing court agrees with the trial court's distribution of assets, but whether the trial court acted arbitrarily without the employment of conscientious judgment. *In re Marriage of Legge* (1982), 111 Ill. App. 3d 198, 443 N.E.2d 1089.

■ In the case at hand, husband testified that prior to and during his marriage to wife, he was involved in commodities trading. Hus-

band stated that he lost approximately $14,500 and had to take out loans to cover his losses. Husband further stated that these investments were made in hopes of obtaining a profit. There was no evidence of intent to wilfully dissipate marital assets. Additionally, the investments were made prior to and during the early part of the marriage when there was no indication whatsoever of marital discord. Since the investments were not made in contemplation of dissolution, the acts of husband do not constitute dissipation of marital assets within the meaning of the IMDMA. As such, there was no abuse of discretion.

■ In the judgment order, each party was ordered to pay their own attorney fees. Wife maintains that the court erred in failing to order husband to pay her attorney fees.

The IMDMA specifically provides that a court, after due consideration of the financial resources of the party, may order one spouse to pay the attorney fees of the other. (Ill. Rev. Stat. 1985, ch. 40, par. 508(a).) The allowance of attorney fees, however, is within the sound discretion of the trial court and its determination will not be overturned absent an abuse of discretion. (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 229, 446 N.E.2d 499, 509.) The statute merely requires the court to consider "the financial resources of the parties." (Ill. Rev. Stat. 1985, ch. 40, par. 508(a).) This court has held that the allowance of attorney fees in a divorce proceeding must be based upon a finding that one spouse is financially unable to pay the fees while the other is able to do so. *In re Marriage of Weaver* (1985), 133 Ill. App. 3d 825, 830-31, 479 N.E.2d 452, 455.

■ Both parties accumulated substantial attorney fees as a result of the dissolution proceedings. Both parties are gainfully employed in a full-time capacity, wife earning a gross income of approximately $15,000 and husband earning a gross income of approximately $40,000. Husband presented the court with a summary of monthly expenses in excess of $2,000. Husband further noted that he had incurred substantial expense in transporting Joshua to Texas for visitation. The financial situation of both parties indicated that each was able to pay for their own attorney fees and consequently, there was no abuse of discretion.

■ Wife's final contentions on appeal regarding admission of evidence and denial of her post-trial motion need not be substantively addressed. In her brief on appeal, wife makes minimal vague references to the trial court record and cites no legal authority in support of these allegations.

Supreme Court Rule 341(e)(7) (103 Ill. 2d R. 341(e)(7)) provides

that a litigant's brief shall contain the "contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." A contention that is supported by some argument, but by no authority whatsoever, does not satisfy the requirements of Supreme Court Rule 341(e)(7). (*In re Marriage of Anderson* (1985), 130 Ill. App. 3d 684, 474 N.E.2d 911, citing *Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 453 N.E.2d 1133.) The failure to meet the requirements of this rule renders the issues waived. Consequently there is no need to address wife's final two contentions.

We find that the trial court abused its discretion in entering a "joint custody award" without following the statutory procedure established in the IMDMA. Additionally, the evidence established at trial regarding custody indicated that wife should be awarded custody of Joshua. The trial court's award of custody to husband was against the manifest weight of the evidence. Consequently, the joint-custody order is reversed, custody is awarded to the wife, and cause is remanded for determination of visitation and support. We affirm the trial court order in all other respects.

Affirmed in part, reversed in part, and remanded.

GREEN and LUND, JJ., concur.