NO. 4-99-1015

6 December 2000

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In re: the Marriage of

CONSTANCE S. CARTER,

Petitioner-Appellant,

and

DAVID W. CARTER,

Respondent-Appellee.

)

)

)

)

)

)

)

)

)

Appeal from

Circuit Court of

Macon County

No. 98D620

Honorable

Thomas E. Little,

Judge Presiding.

_________________________________________________________________

JUSTICE MYERSCOUGH delivered the opinion of the court:

In October 1998, petitioner, Constance Carter, filed a petition for dissolution of her 26-year marriage with respondent, David Carter.  At a hearing in August 1999, the trial court found that David's mental cruelty constituted grounds for dissolving the marriage and took the case under advisement.  In November 1999, the trial court entered a final judgment dissolving the marriage, allocating marital assets and debts, granting custody of a minor child to Constance, and ordering David to pay $75 per week in child support.  The trial court also ordered the parties to obtain a mortgage loan on the marital residence to pay off marital debts and to sell the marital residence when the parties' remaining minor child turns 18 years old or graduates from high school, whichever occurs last.  Constance appeals, arguing that the trial court (1) abused its discretion in burdening her with David's gambling debts in its division of marital property, (2) abused its discretion in finding that David did not dissipate marital assets, (3) erred in finding that the marriage underwent an irreconcilable breakdown in July 1999, (4) and was without authority to consolidate David's gambling debts into a new mortgage secured by the marital residence.  We reverse and remand.

I. BACKGROUND

David and Constance married in 1973.  They had one minor child, aged 17 years, at the time of the August 1999 hearing.  Constance worked at a bank, earning $400 gross income per week.  David worked as a counselor, earning $322 gross income per week.  In addition, David officiated high school and youth sporting events, earning an additional $500 per month.

During the marriage, the parties lived in a home that they purchased together.  The marital residence had a market value between $50,000 and $55,000 according to Constance's estimate.  David estimated the value of the home to be $65,000.  Constance paid off the mortgage by July 1998.  Each party owned an automobile subject to a car loan.  Their checking or savings accounts amounted to no more than a few hundred dollars each.  Each party had an individual retirement account (IRA) amounting to about $5,000.  Constance had a 401(k) retirement plan worth almost $47,000.  David's retirement plan was worth about $11,600.  Each party had monthly expenses, excluding debt repayment, of $900 to $1,000 each.

The parties had previously separated in April 1992, when Constance received a telephone bill for over $3,700 in toll charges that David incurred on their home telephone by calling several "900" numbers to play games and receive gambling-related sports information.  David told Constance that he would pay off the bill.  However, David established a credit card account with Ameritech (later MBNA America) in April 1992 to borrow $500 toward paying off the telephone bill.  David did not make any additional charges to that account.  Nonetheless, the July 1999 outstanding balance was $1,100.

In April 1992, Constance filed a petition for dissolu

tion of marriage.  In December 1992, David admitted incurring debts related to his gambling.  He agreed to stop gambling and amassing debts so that he could move back in with Constance.  Constance then had her April 1992 dissolution petition dismissed.

After David returned to the marital residence in December 1992, the parties lived mostly separate lives.  They ate separate meals.  David often stayed out late at night, and Constance took care of the children.  For the most part, David slept on the couch, but he occasionally slept with Constance.  They maintained individual checking, savings, and credit card accounts.  David agreed to pay the power bill and to continue to pay Constance $110 per week, an amount that he had been ordered to pay her for child support in the 1992 dissolution proceedings.  David did not discuss his credit situation with Constance because "she more or less lived her life and [he] was living [his] life."

This arrangement continued until July 1998 when David stopped contributing to household expenses.  Constance suspected that David was in financial difficulty when she received tele

phone calls from his creditors.  In October 1998, Constance obtained David's credit report and was shocked to discover that he had accumulated over $45,000 in debts.  She did not recognize much of that debt as relating to household expenses, so she assumed that David was gambling again.  She decided to separate from David because he had hidden these debts from her.  On October 27, 1998, Constance filed the instant petition for dissolution based on the grounds of mental cruelty.  David moved out of the marital residence on November 1, 1998.

David's credit card and other unsecured debts increased by approximately $25,000 from his December 1992 total balance of approximately $13,500 to his July 1999 total balance of nearly $38,500.  In December 1992, David owed $7,500 on his Chase Visa credit card.  By December 1992, he had a $6,000 balance in cash advances on a line of credit from Providian National Bank ob

tained in October 1991.  According to David, Constance knew about these two accounts in December 1992.  

    David claimed that he incurred debts after 1992 for "household expenses" and "repairs."  He referred to an exhibit that listed his accounts and a brief explanation of the nature of the charges.  However, David's exhibit accounted for only $7,652 in household expenses out of the $25,000 increased debt incurred from December 1992 to July 1999:  he paid $1,823 in income taxes   in 1995 and 1996; $829 for three car insurance payments; $300 for car repairs; $1,900 for an air conditioner and furnace in the marital residence; $1,100 at Sears for a microwave and Christmas presents; $900 to Illinois Power and his weekly contributions to household expenses; and $800 at Menard's for a storm door for the marital residence.  He also claimed that he spent an unspecified amount for gas, officiating expenses, and miscellaneous items.  He listed from memory the expenses that he paid, but he said that he could not account for every dime that he owed because he could not remember everything since 1992.  David attached credit card statements that established only the balances that he owed as of July 1999, but he did not produce any itemization, receipts, or other statements to support his claim that he borrowed and then spent money for household expenses.   

David's credit card balances increased in part because he made only minimum payments on his accounts.  In July 1999, his total minimum monthly credit cards payments were at least $1,000.  He realized that he did not pay anything on the actual debts because his minimum payments were often insufficient to meet credit fees and periodic finance charges.  In July 1999, for example, David incurred multiple $30 monthly fees for making late payments, having checks returned, and exceeding his credit limits.  David also incurred periodic finance charges at effec

tive annual rates exceeding 20%, which he characterized as being "exorbitant."  The only way that he tried to reduce his debt burden was to transfer the balances to other credit card ac

counts.  For instance, he created an American Express account in November 1995 to transfer balances of $3,000 from his Chase Visa account and $2,000 from his Bank One First USA MasterCard ac

count.    

   All of David's credit card balances included credit fees, although he itemized in his exhibit only $1,000 in fees for 2 of his 10 accounts.  David did not indicate how much of his balances resulted from accumulated interest.  David never sought to reduce his borrowing costs by obtaining a home equity loan even though David owned the marital residence in joint tenancy with Constance.  

At the August 1999 hearing, Constance argued that David's debts resulted from his past and continuing gambling activities.  David maintained that his debts resulted from cash advances to pay household expenses, credit fees, and "exorbitant" interest rates.  The trial court found that all of David's debts were marital and that none of the amounts represented dissipa

tion.  It also found no evidence that David's debt was attribut

able to a gambling problem.  By docket entry, the trial court denied Constance's motion for reconsideration and entered a finding that the marriage was irreconcilably broken in July 1999.

The trial court ordered the parties to obtain a mort

gage loan and pay all marital debts, excluding automobile debts.  Constance received the exclusive use of the marital residence until the minor child becomes 18 years old or graduates from high school, whichever occurs last.  At that time the residence would be sold, with net proceeds applied to pay debts, but the trial court did not specify how excess proceeds, if any, would be divided.  Each party would pay one-half of the monthly payment to amortize the mortgage debt.  Constance had to pay for all real estate taxes and routine repairs, except the parties would each pay one-half of all individual repairs exceeding $500.  

The trial court divided the remaining marital assets and debts as follows:  each party received his/her own IRA, checking, and savings accounts; each party received his/her own automobile and accompanying debt; the parties would equally divide their retirement accounts according to a qualified domes

tic relations order; and Constance received all household goods except a television, videotapes, microwave oven, and some furni

ture.

    II. ANALYSIS

A. Division of Marital Property

Constance argues that the trial court abused its discretion in burdening her with David's gambling debts in its division of marital property.  In her brief, Constance conclu

sively states that the trial court abused its discretion in inequitably allocating half of David's "inordinate" debt to her.   Supreme Court Rule 341(e)(7) (177 Ill. 2d R. 341(e)(7)) provides that an appellate brief shall contain the contentions of the appellant and the reasons therefor, with citations to author

ity.  However, the first section of argument in Constance's brief makes a cross-reference to the third section of her argument on dissipation.  Thus, her contention regarding the trial court's abuse of discretion in dividing marital property does not seem independent of her argument that the trial court erred in not finding dissipation.  See 
In re Marriage of Forbes
, 251 Ill. App. 3d 133, 135, 621 N.E.2d 996, 998 (1993) (no forfeiture even though brief could have been more aptly structured).  Therefore, we will consider whether the trial court erred in failing to consider the statutory factor of dissipation (750 ILCS 5/503(d)(2) (West 1998)).

   B. Dissipation

  Dissipation is one of the statutory factors in section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(d)(2) (West 1998)) that the trial court should consider to divide equitably marital property in just proportions.  Dissipation is defined as the use of marital property for one spouse's benefit or for a purpose unrelated to the marriage at a time when the marriage is undergo

ing an irreconcilable breakdown.  
In re Marriage of Partyka
, 158 Ill. App. 3d 545, 549, 511 N.E.2d 676, 680 (1987).  The issue of dissipation is generally a question of fact, and the trial court's finding concerning dissipation will not be disturbed unless it is against the manifest weight of the evidence or an abuse of discretion.  
In re Marriage of Tietz
, 238 Ill. App. 3d 965, 984, 605 N.E.2d 670, 683-84 (1992).  

Whether a given course of conduct constitutes dissipa

tion depends upon the facts of the particular case; a spouse does not dissipate when spending marital assets for legitimate family expenses and necessary and appropriate purposes.  
Tietz
, 238 Ill. App. 3d at 983, 605 N.E.2d at 683.  However, a court may still find dissipation where a spouse's "use of marital funds for his or her own living expenses *** could be shown to be so selfish and excessive and improper as to constitute an outright waste of marital funds."  
In re Marriage of Hagshenas
, 234 Ill. App. 3d 178, 197, 600 N.E.2d 437, 451 (1992).  A finding of dissipation is possible even though the dissipating party did not derive personal benefit from the dissipation of the asset.  
In re Marriage of Gurda
, 304 Ill. App. 3d 1019, 1025, 711 N.E.2d 339, 343 (1999).

The spouse charged with dissipation of marital funds has the burden of showing, by clear and specific evidence, how the marital funds were spent.  
Tietz
, 238 Ill. App. 3d at 983, 605 N.E.2d at 683.  Vague and general testimony that marital funds were used for marital expenses is inadequate to meet that burden, and the trial court is required to find dissipation when the spouse charged with dissipation fails to meet that burden.  
Partyka
, 158 Ill. App. 3d at 552, 511 N.E.2d at 681-82.  

The trial court set July 1999 as the date for the "irreconcilable breakdown" of the parties' marriage.  This determination was against the manifest weight of the evidence.  The parties separated and Constance filed the present petition for dissolution of marriage near the end of October 1998.  Clearly, the marriage was undergoing an irreconcilable breakdown at least by that time.  

The marriage was irreconcilably broken as far back as 1992, when the parties separated and Constance filed the first dissolution petition.  They separated in 1992 because David incurred gambling-related debts.  David moved back into the marital residence in December 1992 on the condition that he not incur more debts.  Although he occasionally slept with Constance, they lived separate lives for the most part.  Their finances were at arm's length, and they did not share meals or child-rearing responsibilities.  Because David secretly continued to incur debts in spite of agreeing not to do so, the purported reconcili

ation in December 1992 was pretextual.  Thus, even though David returned to the marital residence in December 1992, the marriage was undergoing an irreconcilable breakdown.  See 
Gurda
, 304 Ill. App. 3d at 1022, 1026, 711 N.E.2d at 341, 343 (date of irrecon

cilable breakdown set four years prior to final dissolution petition and one year prior to earlier dissolution petition that had been dismissed).

Because the marriage was undergoing an irreconcilable breakdown since at least 1992, the trial court should have re

quired David to show, by clear and specific evidence, how he spent marital funds represented by the marital debts that he owed.  Although David accounted for a portion of his debts as representing legitimate household expenditures, his explanation of how he spent the rest of the money for "household expenses" and "repairs" was too general and vague to satisfy his burden.  Also, David dissipated marital funds by paying what he called "exorbitant" interest and credit fees, and he offered no reason why he could not have satisfied his delinquent credit card debts out of his assets.  See 
In re Marriage of Charles
, 284 Ill. App. 3d 339, 344, 672 N.E.2d 57, 61 (1996).  Thus, the trial court abused its discretion in not considering David's dissipation of marital assets in equitably distributing marital property in just proportions.  Upon remand, the trial court should reconsider the distribution of marital assets and liabilities in light of David's dissipation of marital assets.  

   C. Mortgage on Marital Residence

Constance also argues that the trial court did not have authority to order her to participate in obtaining a mortgage loan on the marital residence.  We note that the trial court clearly had authority to order a sale of the marital residence and to apply the proceeds to pay the marital debts.  750 ILCS 5/503(i) (West 1998).  However, we must consider whether the trial court could also order that a marital asset be mortgaged and that marital debts be paid out of those proceeds.  We con

clude that the trial court had that authority.

Section 503(i) of the Act (750 ILCS 5/503(i) (West 1998)) provides:  

"(i) The court may make such judgments affecting the marital property as may be just and may enforce such judgments by ordering a sale of marital property, with proceeds therefrom to be applied as determined by the court."

The trial court's power to order a party to pay marital debts by borrowing against marital assets is authorized as a judgment "affecting the marital property as may be just." 750 ILCS 5/503(i) (West 1998).  The trial court is not limited to distributing marital assets and debts (750 ILCS 5/503(d) (West 1998)) and ordering that the assets be sold (750 ILCS 5/503(i) (West 1998)).  To hold otherwise would render the phrase in section 503(i), "such judgments affecting the marital property as may be just," mere surplusage.  750 ILCS 5/503(i) (West 1998).  The next phrase in section 503(i), "and may enforce such judg

ments by ordering a sale of marital property," elaborates on the trial court's powers and does not limit them.  750 ILCS 5/503(i) (West 1998).  Thus, we interpret section 503(i) as according the trial court statutory authority to order parties to mortgage marital property.

Constance maintains that the trial court does not have a general power under section 503(i) to order parties to reorga

nize debts.  
In re Marriage of Foran
, 225 Ill. App. 3d 756, 758, 587 N.E.2d 570, 572 (1992) ("jurisdiction in a dissolution of marriage action is conferred only by statute, and *** [a trial court] may not rely upon its general equity powers").  However, the trial court did not attempt to exercise general equity powers because its judgment clearly "affect[ed] the marital property" according to section 503(i).  750 ILCS 5/503(i) (West 1998).

   Although we hold that the trial court had authority to order the parties to mortgage the marital residence, that power should be cautiously employed in effectuating a debt reorganiza

tion.  Parties may lose bargaining power vis-a-vis their credi

tors if they must settle unsecured debts by incurring new secured debts.  Also, parties' rights to bankruptcy or their homestead exemption may be implicated.

The trial court ordered that the proceeds of a mortgage loan be applied to pay the parties' debts, excluding automobile loans.  Because this order was a part of the trial court's divi

sion of marital property, we remand for the trial court to recon

sider this portion of its order in light of the dissipation of marital assets by David.

III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment.  The cause is remanded for further proceedings consis

tent with this order.

Reversed and remanded.

McCULLOUGH and COOK, JJ., concur.