2016 IL App (2d) 140147
No. 2-14-0147
Opinion filed June 22, 2016

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| LAURIE SCHNEEWEIS, | ) | of Lake County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 09-D-2319 |
| | ) | |
| ANDREW SCHNEEWEIS, | ) | Honorable |
| | ) | Charles D. Johnson, |
| Respondent-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices McLaren and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    The respondent, Andrew Schneeweis, appeals from the judgment for dissolution of marriage entered by the trial court, contending that the trial court erred in finding that he dissipated much of the marital estate by removing funds from marital accounts and using them to engage in high-risk securities trading, without telling his wife, the petitioner, Laurie Schneeweis. We affirm.

¶ 2                                      I. BACKGROUND

¶ 3    The parties were married in 1993. They have three children (Jeremy, Carly, and Haley), all of whom were still minors at the time of the judgment of dissolution. When the parties married, Andrew was working for the computer company CDW in sales and management

positions. He received frequent promotions. Between 2000 and 2005 his gross annual compensation fluctuated between a high of $385,000 in 2004 and a low of $321,679 in 2005. Following the birth of the parties' first child in 1995, Laurie did not work outside the home. Andrew paid most of the bills and made all of the parties' investment decisions.

¶ 4    Following the dissolution trial, the trial court found that the marriage began undergoing an irreconcilable breakdown in June 2005. Neither party contests this finding on appeal.

¶ 5    In July 2005, the parties refinanced their home with Harris Bank. At the same time, unbeknownst to Laurie, Andrew opened a home equity line of credit (HELOC) in his name. The next month, Andrew opened a savings account in his name at Harris Bank without Laurie's knowledge and transferred $46,000 from the HELOC into that account. In the next few months, Andrew also opened a checking account at Harris Bank without Laurie's knowledge.

¶ 6    In 2005, Andrew completed a questionnaire that listed the parties' assets as totaling approximately $1.2 million, plus CDW stock options that Andrew valued at $1.1 million. Those assets included a professionally managed brokerage account at Edward Jones, about 92% of which was invested in conservative investments. In December 2005, the value of the Edward Jones account was a little less than $1 million. Prior to the breakdown of the marriage, both parties viewed the Edward Jones account as a long-term holding for retirement purposes.

¶ 7    Laurie testified that, about this time, Andrew got a new boss whom he did not like, and his duties at CDW changed. He told Laurie that he wanted to quit work. Laurie told him that he should not quit until he found a new job.

¶ 8    In January 2006, Andrew exercised all of his existing CDW stock options, receiving $302,000. He deposited these funds into the parties' joint checking account at Citibank. The following month, Andrew wrote a check transferring $286,000 from the Citibank account to a newly opened Merrill Lynch account. In March 2006, Andrew liquidated the parties' stock in

Citibank, which yielded almost $40,000, and deposited these proceeds into the Merrill Lynch account. He did not tell Laurie about any of these actions.

¶ 9 In July 2006, Andrew was notified that CDW's compensation structure would be changing, with the result that his base pay would increase, but his bonus would be capped. Andrew believed that the changes meant that he would make less money overall. Andrew decided that he would quit his job and that he would begin trading securities on his own account in order to provide for the family.

¶ 10 Andrew quit his job with CDW in October 2006. He did not tell Laurie that he planned to do this; he just called home and said he had quit. Laurie was furious with him, and they had a "big fight" when he got home that day. Laurie wanted Andrew to find another job. Andrew said he wanted to work for himself as a trader, Laurie said she did not think that this was a good idea, and they "pretty much stopped talking to each other."

¶ 11 According to Andrew, when he left CDW he was required to exercise his remaining stock options, and he did so. His December 2006 pay stub showed his total compensation for the year as $601,488. The parties' total income reported on their 2006 tax return was $708,000.

¶ 12 When Andrew quit his job in October 2006, he had no experience or training in day-trading securities. Nevertheless, he immediately began making day trades, using an account at Fidelity. Within the first 90 days, Andrew made trades of more than $4.5 million in securities. In January 2007, Andrew received notices from Fidelity that his trading activities violated security industry regulations. Between January and June 2007, Andrew withdrew $55,000 from the Edward Jones brokerage account for unknown reasons. During this same period of time, he lost more than $89,000 day-trading. Andrew suggested to Laurie that she should get a job to help support the family. Laurie began working part-time at a clothing store.

¶ 13 Laurie did not know what Andrew was doing when he said he was "trading"; he kept her out of the office in their house where he worked. At one point, he told her that she had to leave the house whenever he was trading, because she brought him bad luck and he would lose money when she was around. However, he never discussed the extent of his losses with her. Andrew opened all the mail that came to the house. He began locking the computer he worked on so that no one else could access it. He pass-coded his phone, which he had never done before. He also began locking the door to the office so that no one else could enter. All of the parties' financial records were kept in the office.

¶ 14 In early 2007, Andrew sought to improve his trading results by enrolling in a two-year program of online courses from a company called Investools, and he spent hours on the telephone reviewing possible investment strategies with his personal training coaches. He completed the two-year program and participated in the company's training programs for others. He spent about $24,000 on these activities.

¶ 15 On June 15, 2007, Andrew transferred all of the remaining assets held in the parties' Edward Jones account (about $872,741) to a trading account in his name at Think or Swim, a brokerage affiliated with Investools. (In March 2007, he had rolled $372,940 from his IRA into the Think or Swim account.) Andrew told Laurie that he would be using Think or Swim as a brokerage, but he did not tell Laurie that he had transferred the parties' retirement assets or that he would be using them to trade with. Andrew also withdrew about $515,000 from the Fidelity account and transferred it into the Think or Swim account. As of June 30, 2007, the Think or Swim trading account held $1,134,000 in assets.

¶ 16 Beginning in June 2007, Andrew began using the assets in the Think or Swim account to secure margin debt associated with his day-trading activities. Andrew had no experience with trading on margin before this. According to the parties' 2007 tax return, their total income that

year was $48,377. This total included interest, dividends, distributions, and capital gains from the parties' ordinary investments, $5,951 from Laurie's part-time work at the clothing store, and zero income from Andrew's trading activities.

¶ 17    Andrew continued high-risk trading, funding his trades through increasing margin debt. In August 2008, Andrew had more than $942,000 in margin debt. The stock market declined precipitously between August and October of 2008. Thereafter, Think or Swim executed a margin call, forcing the sale of most of the assets in Andrew's Think or Swim account and leaving only $189,058 in that account.

¶ 18    According to the parties' 2008 federal tax return, the family's total income that year was $107,547. However, the bulk of that number consisted of more than $111,000 in withdrawals from the parties' IRAs and pensions, which counted as taxable income. The actual income comprised $3,680 in wages from Laurie's part-time retail work and about $3,000 in interest and dividends.

¶ 19    At some point, Andrew also invested in certain resort properties in Wisconsin. Laurie knew of these investments, although the mortgages for the properties were solely in Andrew's name. When she told Andrew that she thought these investments were a bad idea, he told her that she did not know "what the f*** [she] was talking about." In 2011, the properties were lost through foreclosure.

¶ 20    In 2009, Andrew took a job with Promethean, a company that provided technology products for schools. He managed its account with CDW. He was not involved in trading securities for Promethean.

¶ 21    In November 2009, Laurie filed a petition for dissolution of the marriage. Around the same time, Andrew confirmed that he was having an affair.

¶ 22    In June 2011, the trial court entered an agreed order embodying the parties' agreement that Laurie would have sole legal custody of the children and establishing the parenting time of both parties.

¶ 23    In March 2012, Laurie served Andrew with a notice of intent to claim dissipation.

¶ 24    Trial of the remaining issues in the dissolution commenced on May 31, 2012, and continued for portions of June 1, August 24, and November 13, 14, and 16, 2012.  Andrew represented himself at trial.  Much of the evidence introduced at trial is summarized above.  In addition, Laurie introduced evidence that Andrew had taken certain other assets from various family members.  The parties had established savings accounts for their children, including Uniform Transfers to Minors Act (UTMA) accounts and 529 (college savings) accounts.  Andrew was the custodian on these accounts.  Between January 2010 and April 2012, more than $13,803 was removed from Carly's UTMA account, and $1,452 was removed from Jeremy's UTMA account.  As of May 2011, $4,700 had been removed from Carly's 529 account, and $8,400 had been removed from Jeremy's 529 account.  Finally, the parties had maintained a safe deposit box at Harris Bank that contained, among other things, rare coins given to Laurie by her grandfather.  The coins were gone from the box when Laurie checked it on March 1, 2010.  She testified that her children had told her that the coins were in Andrew's safe at his house.

¶ 25    The parties also testified at trial as to their recent employment.  In 2010, Andrew moved to a job with Net App.  In July 2011, Andrew was hired as a senior sales manager with PC Mall Sales, at an annual salary of about $60,000.  He was still employed there at the time of trial. During this period, Laurie took classes to renew her teaching certificate and began to look for work as a teacher.  Despite applying for more than 30 teaching jobs, she had not gotten any interviews.  She was laid off from her job at the clothing store in October 2011 and applied for

unemployment benefits. She testified that, at the time of trial, she was receiving public aid and food stamps.

¶ 26    The trial court issued its judgment of dissolution on January 8, 2013. Much of the order was directed to the issue of dissipation. As we have noted, the trial court found that the marriage began to undergo an irreconcilable breakdown in June 2005. Thereafter, without Laurie's knowledge or consent, Andrew quit his job, obtained the HELOC, and withdrew $46,000 from that line of credit, which he used to open two new accounts in his name at Harris Bank. Andrew ultimately withdrew $175,000 from the HELOC, thereby reducing the value of the parties' equity in the marital home by that sum. The trial court found that Andrew "commenced a course of speculative, high-risk investing without the necessary acumen and experience." The court further found that Andrew dissipated marital assets, "in that he caused or allowed the devaluation of the marital estate through his unwise trading practices and his incurring of significant debt without Laurie's knowledge." The court found that Andrew dissipated $890,700.19, which included (1) all of the funds transferred from the Edward Jones account to Think or Swim, which were redeemed to pay the margin debt ($715,700.19), and (2) all of the $175,000 withdrawn from the HELOC.

¶ 27    The trial court further found that, although Laurie would be entitled to maintenance as a matter of law under section 504 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/504 (West 2012)), "based upon Andrew's intentional diminishment of his earnings," he could not afford to pay maintenance. Accordingly, the trial court awarded 65% of the marital property to Laurie and 35% to Andrew. As the marital estate was fairly small due to Andrew's dissipation, this distribution required Andrew to pay Laurie $481,433.42, minus 35% of the value of the marital home as determined through the submission of appraisals. The

trial court also removed Andrew as the custodian of the children's accounts and ordered him to return the rare coins to Laurie.

¶ 28    Andrew filed a motion to reconsider, arguing that the trial court erred in setting the date on which the marriage began to break down and in finding that his investment losses constituted dissipation.  The trial court denied this motion.  Regarding the date when the marital breakdown began, the trial court noted that, in 2009, Andrew wrote emails stating that he had "been in isolation for 4 years without any *** support, in any capacity" and that "for the last 4 years" he had "miss[ed] having a relationship" with Laurie.  Thus, Andrew himself identified 2005 as the beginning of the breakdown of the marriage.  The trial court also found that Andrew had begun "to act on his own financially" and had "started making financial decisions that were inconsistent with the parties' prior practices" (such as opening the HELOC) in mid-2005, further demonstrating that the parties were no longer functioning as a partnership.  Regarding the issue of whether the investment losses constituted dissipation, the trial court confirmed its finding of such dissipation, stating that the evidence showed that after the marital breakdown began Andrew "made secretive, risky and progressively more destructive decisions with the funds that he exercised control over."  Further, there was "ample evidence that Andrew incurred debt in various forms *** without Laurie's knowledge or consent."  Thus, despite Andrew's testimony that his intent was to make a profit, the trial court found that there was a legal and factual basis for its finding of dissipation.  Finally, the trial court found that Andrew had not adequately supported his argument that some of the funds he was alleged to have dissipated had been spent for a marital purpose, as he had not shown that those funds had been used for any specific expenses that were marital in nature.

¶ 29                                   II. ANALYSIS

¶ 30    On appeal, the only portion of the judgment of dissolution challenged by Andrew is the trial court's finding that Andrew dissipated $890,700.19 of the marital estate, and its consequent allocation of the remaining marital property.

¶ 31                                A. Standard of Review

¶ 32    We begin by identifying the standard of review applicable to the finding of dissipation in this case.  Andrew argues that the relevant issue is whether, as a matter of law, imprudent investing can amount to dissipation.  He argues that this issue is one of statutory interpretation—interpreting the meaning of "dissipation" as that term is used in section 503(d) of the Marriage Act (750 ILCS 5/503(d) (West 2012))—and thus we should review the trial court's decision *de novo*.  See *Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 43 (2003).  We firmly reject this contention as contrary to longstanding Illinois law.

¶ 33    Dissipation is one of the factors in section 503(d) of the Marriage Act that a trial court must consider in allocating marital property equitably in just proportions.  *In re Marriage of Carter*, 317 Ill. App. 3d 546, 551 (2000).  Dissipation is defined as the " 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.' "  *In re Marriage of O'Neill*, 138 Ill. 2d 487, 497 (1990) (quoting *In re Marriage of Petrovich*, 154 Ill. App. 3d 881, 886 (1987)).

¶ 34    The issue here is not the definition of "dissipation": that definition is well settled.  Rather, it is whether Andrew's conduct fell within that definition.  This is a question of fact.  "Whether dissipation has occurred is a question of fact to be determined by the trial court, and such a determination will not be disturbed on appeal unless it is against the manifest weight of the evidence."  *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 374 (2008); see also *Carter*, 317 Ill. App. 3d at 551; *In re Marriage of Sobo*, 205 Ill. App. 3d 357, 359 (1990).  In arguing that we should treat the issue of whether his conduct constituted dissipation as a purely legal issue,

Andrew is unable to cite a single Illinois case that would support this proposition. The foreign case law cited by Andrew does not persuade us to overturn longstanding Illinois precedent on this issue.

¶ 35    Moreover, as a practical matter, "*[w]hether a given course of conduct constitutes dissipation depends upon the facts of the particular case.*" (Emphasis added.) *Carter*, 317 Ill. App. 3d at 551. This statement is as true in this case as in any other dissipation case: Andrew's decision to embark on a course of high-risk investing with his family's savings did not occur in a vacuum, and the question of whether his conduct amounted to dissipation depends on the context in which it occurred. We therefore review the trial court's finding of dissipation deferentially and will not reverse it unless it is against the manifest weight of the evidence, that is, unless "the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544 (2007).

¶ 36                                    B. Finding of Dissipation

¶ 37    As noted, dissipation is the "use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown." *O'Neill*, 138 Ill. 2d at 497. "An act may constitute dissipation even though a spouse does not necessarily derive a personal benefit from it if the expenditure has some detrimental effect upon the marital estate." *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 67; see also *In re Marriage of Daebel*, 404 Ill. App. 3d 473, 491 (2010) (spouse's deliberate conduct that diminished the value of the marital home constituted dissipation). The spouse charged with dissipation has the burden of proving, though clear and specific evidence, how the marital funds were spent, and vague and general testimony that the funds were used for marital expenses is inadequate to meet this burden. *Carter*, 317 Ill. App. 3d at 552.

¶ 38    For the purposes of the appeal, Andrew concedes that the trial court correctly found that he controlled and directed all of the investments without input from Laurie and failed to discuss his trading activities with her.  However, he argues that his course of conduct did not amount to dissipation because he did not intend to lose money: he was simply caught in a stock market crash that also ensnared millions of other investors around the world.  According to Andrew, he made his investment decisions in "good faith" and simply experienced bad luck, and he should not be disproportionately penalized for this by charging the stock market losses solely to him.  In other words, he argues, he was foolish but not malicious.

¶ 39    We reject this argument for several reasons.  As an initial matter, we do not believe that bad intent is necessary for a finding of dissipation.

¶ 40    Intent is one factor that a court may consider when determining whether dissipation has occurred.  See, *e.g.*, *In re Marriage of Thomas*, 239 Ill. App. 3d 992, 994 (1993) (finding of dissipation was proper when husband intentionally sabotaged a family business when the marriage was undergoing a breakdown, while simultaneously directing customers to a new business formed by him).  However, it is by no means the sole relevant factor, or a dispositive factor.  Indeed, the definition of dissipation does not include any reference to the dissipating spouse's intent.  Rather, dissipation is founded on objective factors: whether the alleged dissipation occurred while the marriage was undergoing a breakdown, whether the relevant expenditure or conduct was undertaken for a purpose unrelated to the marriage, and whether the expenditure or conduct benefited only the spouse charged with dissipation.  *O'Neill*, 138 Ill. 2d at 497.

¶ 41    We acknowledge that there is a spectrum of risky conduct by a spouse and that courts may arrive at different estimations of whether the conduct is merely a combination of good faith and bad luck or clear dissipation.  However, the dissipating spouse's intent is not dispositive in

this determination. For instance, gambling with marital funds historically has been treated as dissipation, despite the fact that gamblers no doubt go to the racetrack or the casino intending to win. See, *e.g.*, *Sobo*, 205 Ill. App. 3d at 360 (husband's withdrawals from marital assets to pay gambling debts was dissipation); *In re Marriage of Smith*, 114 Ill. App. 3d 47, 51 (1983) (husband's spending on a trip to Las Vegas "was obviously not money spent for a marital purpose"); see also *In re Marriage of Rimmele*, 102 Ill. App. 3d 88, 90 (1981) (tax liability triggered by withdrawal from retirement plan should be charged wholly to husband where withdrawal was used to fund husband's activities including gambling).

¶ 42    In noting the nondispositive nature of the dissipating spouse's intent, we depart somewhat from the holding of *In re Marriage of Drummond*, 156 Ill. App. 3d 672 (1987). In that case, the Fourth District of the Illinois Appellate Court affirmed the trial court's finding that a husband's losses from commodities trading did not constitute dissipation, commenting that "[t]here was no evidence of intent to wilfully dissipate marital assets." *Id*. at 684. However, the reviewing court also noted that "the investments were made prior to and during the early part of the marriage when there was no indication whatsoever of marital discord." *Id*. Further, the reviewing court noted that "[w]hether a given course of conduct constitutes dissipation within the meaning of the [Marriage Act] depends upon the facts of the particular case" and that the standard of review required deference to the trial court's finding of no dissipation. *Id*. at 683. Thus, we do not find the *Drummond* court's comments about intent determinative of that court's holding, nor do they require us to reach a different result here.

¶ 43    Moreover, we reject Andrew's argument that he was acting "in good faith" when making his high-risk investments. Andrew argues that his stated intent—to earn a living for his family through investing—was directly "related to the marriage," and thus his conduct cannot constitute dissipation. But Andrew's self-serving statements about his intentions are not the only evidence

of the "purpose" of his conduct. The record contains ample evidence that Andrew, the acknowledged sole financial provider for his family, was aware of the devastating effect that his conduct could have on his family, yet he deliberately chose to increase the risk to them—quitting his high-paying job, incurring debt without telling Laurie, and ultimately appropriating essentially all of the family's savings in order to fund his need for increasing amounts of assets to secure his mounting trading debt. This conduct does not show good faith by Andrew, it shows extreme recklessness—indeed, gambling—by someone who no longer valued his family's financial security. The trial court did not err in finding that this course of conduct was not "related to the marriage."

¶ 44    Andrew contends that his decision to begin day-trading was not unreasonable, pointing to the fact that, immediately after he graduated from college, he obtained a license to trade securities and he was briefly employed selling investment products. In addition, once he began trading, he attempted to gain guidance and investing skill through the online Investools classes. However, at the time he decided to quit his job, it had been decades since Andrew had worked in an investment-related job, and he had never supported himself, much less his family, through trading securities. Indeed, he was a complete neophyte in day-trading and trading on margin. The record fully supports the trial court's determination that Andrew's course of conduct was reckless.

¶ 45    Andrew also argues that, even if his conduct could amount to dissipation, the trial court should not have charged him with any diminution of marital assets that occurred before August 2008, when he first began to sustain "significant, irreversible losses" from his trading. However, the relevant time frame for dissipation commences when the marriage begins to undergo an irreconcilable breakdown. *Holthaus*, 387 Ill. App. 3d at 375. Here, it is undisputed that that

period began in June 2005. The trial court did not err in considering Andrew's conduct throughout the subsequent period.

¶ 46     Andrew also asserts that his trading losses were comparable to those suffered by other investors during the Great Recession. To support this contention, he relies on two tables, one listing the gain or loss of Andrew's Think or Swim account in each month between July 2007 and March 2009, and the other showing the value of that account as compared to the decline in the Standard & Poor 500 and NASDAQ indexes. However, neither of these tables was properly included in the record on appeal, and thus we do not consider them. *In re Parentage of Melton*, 321 Ill. App. 3d 823, 826 (2001). Further, Andrew never made this argument to the trial court. A party may not raise on appeal arguments never raised in the trial court. *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 127 (2010). We therefore do not address this argument.

¶ 47     Andrew's remaining arguments relate to the amount of the dissipation found by the trial court. Because we find that most of these arguments were forfeited through Andrew's failure to raise them before the trial court, we begin by detailing the arguments that *were* raised before the trial court.

¶ 48     In its judgment of dissolution, the trial court found that Andrew dissipated: (1) "all funds transferred from Edward Jones to Think or Swim and redeemed to pay margin debt," totaling $715,700.19; and (2) Andrew's draws from the HELOC, which totaled $175,000. In his motion for reconsideration, Andrew argued (as relevant here) that $270,000 of the Think or Swim account had been transferred to the parties' joint Citibank account, out of which household expenses were paid. Similarly, without identifying any specific sum, Andrew argued that "a portion of the funds from the HELOC were spent primarily on marital expenses." The trial court rejected these arguments, finding that, although there was evidence of marital expenses during the relevant time period, Andrew had failed to show that any of the specific funds that the court

found to have been dissipated had actually been used for these marital expenses or for any other marital purpose.

¶ 49    On appeal, Andrew raises several arguments that he did not raise below.  He begins by arguing that, although the trial court found that he dissipated $715,700.19 of the Think or Swim account, he transferred $371,625.05 out of that account to the parties' joint Citibank account.  He notes that the Citibank account was the account used to pay the parties' household expenses and argues that Laurie never alleged that he dissipated any of the funds in the Citibank account.  Thus, by Andrew's reasoning, regardless of what happened to the funds after they were transferred to the Citibank account, once the transfer occurred they could no longer be considered to have been dissipated.  There are several problems with this argument.  First, it is forfeited as to any amount beyond the $270,000 identified in the motion to reconsider.  *Id*.  Second, it lacks merit.  Not surprisingly, Andrew cites no legal support whatsoever for the proposition that the transfer of funds alleged to have been dissipated into a joint account automatically renders those funds non-dissipated.  (And as a factual matter, the record reflects that at least some funds in the Citibank account (*e.g.*, the $286,000 check written to Merrill Lynch) were used to fund Andrew's trading.)  Finally, considering that the amount found to have been dissipated was the amount "redeemed to pay margin debt," we are at a loss to understand how this amount could include amounts that were transferred to the Citibank account.  For all of these reasons, we reject Andrew's argument.

¶ 50    Andrew also argues that he transferred $18,000 from the Think or Swim account directly to Laurie, and as there is no allegation that she dissipated any monies, this amount should be deducted from the amount he was found to have dissipated.  This argument suffers from some of the same flaws as Andrew's argument about the transfers to the Citibank account: (1) it is

forfeited, and (2) Andrew has not shown that this amount was included in the $715,700.19 that the trial court found to have been dissipated.

¶ 51    Andrew's final argument on appeal is that the amount of dissipation should not have included $127,400 of the $175,000 Andrew withdrew from the HELOC, because this $127,400 was transferred into the joint Citibank account. As with the amounts transferred from the Edward Jones account into the Citibank account, Andrew argues that the transfer of the draws on the HELOC to the Citibank account means that those draws were not dissipated. As with the Edward Jones account, we find this argument both forfeited (because, in his motion for reconsideration, Andrew did not identify any specific amounts that he claimed had been transferred to pay household expenses) and unsupported by any proper legal authority. We also note that the trial court found that Andrew had failed to prove that the dissipated funds transferred into the Citibank account were the source of any payments of household expenses. There is no basis to overturn this finding on appeal. Lastly, we reject Andrew's argument that Laurie admitted, in a 2010 motion, that all of the draws on the HELOC were made in order to pay marital expenses. Andrew never raised this argument in the trial court and thus it is forfeited. *Id*. Further, our review of the record does not support Andrew's argument. Thus, we find forfeited or without merit all of Andrew's arguments with respect to the amount of dissipation.

¶ 52                                    III. CONCLUSION

¶ 53    For all of the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 54    Affirmed.